**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**19-CR-741 (WHP)**

───────────────────────────────────────────

**UNITED STATES OF AMERICA**

**-against-**

**BRYAN COHEN,**

**Defendant.**

───────────────────────────────────────────

**SENTENCING MEMORANDUM ON**
**BEHALF OF BRYAN COHEN**

Defendant Bryan Cohen, by and through undersigned counsel, submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence following his guilty plea to one count of Conspiracy to Commit Securities Fraud in violation of 18 U.S.C. § 371. In view of the unique factors of this case, we request a substantially downward variance from the advisory United States Sentencing Guidelines (the "Guidelines") range to a sentence of time served and two years of supervised release which includes a special condition that Bryan performs very substantial community service of 2,000 hours, equivalent to a year of full-time unpaid work. We respectfully submit that such a sentence would be sufficient but not greater than necessary given Bryan's role in the offense (including his voluntarily cessation of all criminal conduct years before his arrest), his early acceptance of responsibility, his otherwise exemplary life defined by hard work and selfless acts, the multitude of severe collateral consequences (including a lifetime bar from his profession and removal from the United States) that stem from his conviction, and the dangers posed by the unprecedented COVID-19 pandemic.

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  PROCEDURAL HISTORY ................................................................................... 4

III. NATURE AND CIRCUMSTANCES OF THE OFFENSE ................................... 6

IV. UNRESOLVED OBJECTIONS TO THE PSR .................................................... 10

V.  BRYAN'S PERSONAL HISTORY AND CHARACTERISTICS ..................... 12

   A.  Bryan's Upbringing and Education ............................................................ 12

   B.  Bryan's Character and Values ................................................................... 15

   C.  Bryan's Dedication to His Family ............................................................. 19

   D.  Bryan's Exceptional Selfless Acts Towards Those in Need .......................... 21

   E.  Bryan's Professional Career ..................................................................... 28

   F.  Bryan Has Been a Passionate and Devoted Mentor to Many ...................... 32

   G.  Bryan Provides Critical Support to Olga, His Partner .............................. 36

VI. RELEVANT SENTENCING FACTORS ............................................................ 39

   A.  Our Proposed Sentence Is Sufficient to Provide a Just Punishment ............... 39

   B.  The Advisory Guidelines Do Not Properly Reflect the Degree of Bryan's
       Culpability .............................................................................................. 41

   C.  A Non-Custodial Sentence Would Adequately Reflect the Out of Character
       Nature of the Offense in Light of Bryan's History and Characteristics ......... 43

D.   Bryan's Role in The Offense as Well as His Voluntary Cessation of All
     Criminal Conduct Two Years Before His Arrest Supports Leniency.............................. 45

E.   Bryan Has Promptly Accepted Responsibility and Is Deeply Remorseful..................... 46

F.   Neither Specific nor General Deterrence Necessitate Sentencing Bryan to a
     Period of Incarceration.................................................................................................. 49

G.   A Non-Custodial Sentence Would Avoid Unwarranted Sentence Disparities
     with Similarly Situated Defendants .............................................................................. 52

H.   The Danger of Sentencing Disparity is Greatly Enhanced by Virtue of Bryan's
     Non-Citizen Status........................................................................................................ 57

I.   The COVID-19 Pandemic Coupled with Bryan's Specific Medical Condition
     Reinforce the Necessity for a Non-Custodial Sentence ................................................ 63

J.   Should the Court Impose a Sentence of Time Served and Community Service,
     Supervised Release and Community Service Can Be Served in France ......................... 68

K.   Should the Court Deem Further Confinement Is Necessary, Home Detention
     Can Be Served in France................................................................................................ 72

VII.   CONCLUSION ............................................................................................................ 74

# TABLE OF AUTHORITIES

## Statutes and Rules

18 U.S.C. § 371 ...................................................................................................... i

18 U.S.C. § 3553(a)......................................................................................... *passim*

U.S.S.G. § 2B1.1(b)(1) ............................................................................................ 42

Fed. R. Crim. P. 32(b)(1) ........................................................................................ 68

## Cases

*Gall v. United States*, 552 U.S. 38 (2007) .................................................... 12, 45

*Koon v. United States*, 518 U.S. 81 (1996) ......................................................... 12

*Nelson v. United States*, 555 U.S. 350 (2009) .................................................... 42

*Pepper v. United States*, 562 U.S. 476 (2011) ............................................... 12, 49

*S.E.C. v. Cohen*, 19-cv-9645 (S.D.N.Y. 2019)...................................................... 4

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)................... 42, 44

*United States v. Allen*, 11-cr-997 (S.D.N.Y. Mar. 15, 2016) ............................ 56

*United States v. Booker*, 543 U.S. 220 (2005) ............................................. 21, 41

*United States v. Bowers*, 09-cr-496 (S.D.N.Y. Sep. 16, 2009) ............... 54, 55, 56

*United States v. Chow*, 17-cr-667 (S.D.N.Y. Jan. 17, 2019)............................. 54

*United States v. Collotta*, 07-cr-143 (S.D.N.Y. Oct. 4, 2007)........................... 56

*United States v. Connolly*, 16-cr-370, Dkt. 457 (S.D.N.Y. Nov. 19, 2019)......58-59, 69

*United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005)...................................... 22

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ...................................... 42

*United States v. Curtler*, 15-cr-670 (S.D.N.Y. Apr. 9, 2019) .......................... 69

*United States v. Demane Debih*, 18-cr-184 (S.D.N.Y.) ...................................... 6

*United States v. Devlin*, 08-cr-1307 (S.D.N.Y. Mar. 23, 2012) ........................ 55

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004)....................................42, 50

*United States v. Faibish*, 12-cr-265, 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015)....................42

*United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006).................................................................49

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008)........................................................69

*United States v. Hernandez*, 18-cr-834, Dkt. 440 & 451 (S.D.N.Y. Mar. 25 & Apr. 2, 2020).....66

*United States v. Holzer*, 09-cr-470 (S.D.N.Y. Sep. 29, 2009)........................................................55

*United States v. Howell*, 412 F. App'x 794 (6th Cir. 2011)............................................................45

*United States v. Jung*, 18-cr-518 (S.D.N.Y. Jun. 17, 2019)...........................................................53

*United States v. Kwok*, 12-cr-405 (S.D.N.Y. Oct. 17, 2012)..........................................................56

*United States v. Lavidas*, 19-cr-716 (S.D.N.Y. 2020)......................................................................6

*United States v. Leon*, 19-cr-103, 2019 WL 5423600 (E.D.N.Y. Oct. 23, 2019) ........................49

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994)........................................................................72

*United States v. Millul*, 18-cr-579, Dkt. 156 (S.D.N.Y. Aug. 27, 2019).......................................58

*United States v. Ng*, 11-cr-161 (S.D.N.Y. May 9, 2012) ...............................................................56

*United States v. Nkanga*, 18-cr-713, 2020 WL 1529535 (S.D.N.Y. Mar. 31, 2020) ...................66

*United States v. Okada*, 07-cr-144 (S.D.N.Y. May 6, 2008) .........................................................56

*United States v. Peterson*, 11-cr-665 (S.D.N.Y. Oct. 11, 2011) ................................................55-56

*United States v. Peterson*, 11-cr-664 (S.D.N.Y. Apr. 11, 2012)................................................55-56

*United States v. Robson*, 14-cr-272 (S.D.N.Y. Nov. 14, 2016)......................................................69

*United States v. Saltsman*, 07-cr-641 (E.D.N.Y. Jul. 28, 2010)................................................69-70

*United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009)................................................................45

*United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000)..............................................................21-22

*United States v. Stewart*, 14-cr-272 (S.D.N.Y. Feb. 14, 2017) .....................................................69

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009)................................................................21-22

*United States v. Tsai*, 19-cr-675 (S.D.N.Y. Jan. 17, 2020) ......................................................53-54

*United States v. Xu*, 11-cr-777, 2012 WL 955366 (E.D.N.Y. Mar. 13, 2012).............................. 57

*United States v. Yagami*, 14-cr-272 (S.D.N.Y. Mar. 9, 2017)...................................................... 69

## Other Authorities

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Just. 1, 28 (2006).......... 52

"*People Who Are at Higher Risk for Severe Illness,*" Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html* .............................................................................................................................. 2

"*COVID-19 Dashboard,*" Johns Hopkins University, *https://coronavirus.jhu.edu/map.html*...... 63

"*The timetable for a coronavirus vaccine is 18 months. Experts say that's risky,*" CNN.com (Apr. 1, 2020), *https://www.cnn.com/2020/03/31/us/coronavirus-vaccine-timetable-concerns-experts-invs/index.html* ............................................................................................ 63

"*COVID-19 Cases,*" BOP.gov, *https://www.bop.gov/coronavirus/*............................................. 65

"*Largest outbreaks in the United States,*" The New York Times, *https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html* ................................... 65

"*More Than 70% of Inmates Tested in Federal Prisons Have Coronavirus,*" Wall Street Journal (Apr. 30, 2020), *https://www.wsj.com/articles/more-than-70-of-inmates-tested-in-federal-prisons-have-coronavirus-11588252023*................................................................. 65

"*In four U.S. state prisons, nearly 3,300 inmates test positive for coronavirus -- 96% without symptoms,*" Reuters (Apr. 25, 2020), *https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in-idUSKCN2270RX* ....................................................................... 65

"*People with Moderate to Severe Asthma,*" Centers for Disease Control and Prevention, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html*.................... 67

"*CDC director warns second wave of coronavirus is likely to be even more devastating,*" The Washington Post (Apr. 21, 2020), *https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/* ..... 67

"*France Coronavirus Map and Case Count,*" The New York Times, *https://www.nytimes.com/interactive/2020/world/europe/france-coronavirus-cases.html*.......... 73

I.   **<u>INTRODUCTION</u>**

Bryan Cohen, age 34, a relatively young man, will spend the balance of his life regretting and paying for the criminal conduct for which he is soon to be sentenced. His actions have resulted in a personal and professional collapse from which he may never recover. Although sentencing has not yet occurred, his punishment most certainly has. Indeed, Bryan's once promising career in investment banking is over and the significant publicity surrounding his arrest and conviction has caused him and his family extreme public humiliation.

Nothing in this memorandum is meant to justify or excuse Bryan's criminal conduct; rather, it is intended only to explain how a hard-working and fundamentally decent man, ended up a convicted felon facing certain deportation from a country he intended to make his home. Bryan appreciates that he has no one but himself to blame for his conduct and recognizes that he will be punished by this Court for his transgression. It is this understanding that led him to promptly accept responsibility and plead guilty shortly after his arrest.

We submit, however, that Bryan's conduct, though serious, does not necessitate a period of incarceration. Notably, there are several crucial factors that mitigate against a prison sentence:

- Nearly two years before his arrest, Bryan voluntarily disassociated himself with the person he committed the instant offense with and ceased all criminal conduct out of a sense of regret and wrongdoing.

- Bryan's illegal conduct should be considered against the backdrop of a life that has been defined by selfless acts, a dedication to family and friends, and an exceptional work ethic (*see* Letters of Support, Exhibits 2–69).

- Bryan promptly accepted responsibility for his actions, he is deeply contrite, and he is committed to paying his debt to society and rebuilding his life. His genuine remorse is exemplified by his prompt plea, early settlement with the Securities and

1

Exchange Commission ("SEC") in a parallel civil case that will result in a bar from the securities industry, and full satisfaction of his $260,000 forfeiture obligation prior to sentencing.

- As a result of his felony conviction, Bryan, as a French citizen, will be deported from the United States and be rendered inadmissible to this country. Bryan's partner will also face the consequences of having to leave the country where they had hoped to raise a family.

- A sentencing parity analysis warrants a substantial downward variance as courts in the district have imposed meaningfully below-Guidelines sentences in nearly every insider trading case in recent years. Specifically, probation sentences have routinely been imposed for conduct comparable or even more severe than Bryan's.

- Bryan's non-citizen status necessitates that, if sentenced to any period of incarceration, he will receive disproportionate treatment as any time behind the bars will be significantly longer, more restrictive and served in harsher conditions than if he were a similarly situated U.S. citizen.

- Bryan has been under home detention for seven months, largely separated from family and friends, with no ability to work. Although the initial bail determination by this Court was eminently fair due to Bryan's citizenship, Bryan's liberty has already been significantly restricted as a result.

- Bryan suffers from chronic asthma which places him at a heightened risk of suffering severe illness or death from COVID-19 if exposed to the virus.[1]  The global pandemic has been spreading at an unprecedented pace in prisons and jails all over the country, and home confinement has been recommended as a tool to be utilized for non-violent offenders with pre-existing medical conditions in order to combat the dangers that COVID-19 poses.

Bryan's application for a non-custodial sentence is by no means a request for sympathy, but rather a respectful appeal to reason and understanding. We seek a just punishment that balances the crime Bryan has committed, and for which he is extremely remorseful, with the extraordinary good

---

[1] *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html*.

he has accomplished as a community member, a family member, and a mentor to many others despite his relatively young age. Our hope is that, given the entirety of his life thus far, all that he has accomplished, all that he has already lost, and all that he will be deprived of in the future, this Court will conclude that a period of incarceration is neither necessary nor an appropriate punishment.

Under these circumstances, we respectfully submit that a sentence of time served with supervised release and a very meaningful community service condition of 2,000 hours, equivalent to one year of full-time work, is "sufficient but not greater than necessary" and fully satisfies the objectives of 18 U.S.C. § 3553(a). Given Bryan's skills and the mission he would be supporting (further described *infra*), this proposed sentence would provide a way for a fair and just punishment to achieve something meaningful, beneficial and productive for the community and the underprivileged children that Bryan would dedicate himself to nurture.

Should the Court, however, deem that some additional confinement is necessary to achieve a just punishment, we respectfully submit that a special condition of home detention (to be served in France)[2] would satisfy this objective. Such a condition balances the need to restrict Bryan's liberty with the inequitable custody consequences of his status as a non-citizen and the unnecessary danger caused by incarcerating a deportable, non-violent, first-time offender with a pre-existing medical condition listed as a primary risk factor for COVID-19 during the unprecedented global pandemic that is materially affecting the functioning of the Federal Bureau of Prisons ("BOP").

---

[2] Bryan's lack of immigration status in the United States as a result of his conviction makes a sentence of home detention in the United States impracticable.

3

II.    **PROCEDURAL HISTORY**

Bryan was arrested in his apartment at 6:00 a.m. on October 18, 2019 on a two-count indictment. Bryan was eventually released on bail conditions primarily consisting of a $750,000 bond secured by $250,000 cash and home detention with electronic monitoring—with which he has been fully compliant for seven months. After retaining the undersigned counsel, receiving basic Rule 16 discovery, and being arraigned on a superseding indictment on December 16, 2019, Bryan immediately accepted responsibility for his conduct. With Bryan's authorization, counsel met with the Government to communicate Bryan's intention to resolve the matter. In short order, Bryan accepted the Government's plea agreement and consented to proceed with his plea before a magistrate judge. On January 7, 2020, Bryan pled guilty to his criminal conduct before Magistrate Judge Debra C. Freeman and consented to the Government's preliminary order of forfeiture for $260,000. This Court accepted Bryan's plea on January 28, 2020.

As a result of his arrest, Bryan was initially suspended from his long-time employer, Goldman Sachs, and was eventually terminated on December 15, 2019.

Additionally, the SEC filed a civil action against Bryan on October 18, 2019. *See S.E.C. v. Cohen*, 19-cv-9645 (CM). After waiving discovery, Bryan agreed to a settlement in principle with the SEC on March 12, 2020. After the SEC completed its internal approval process, the parties submitted a consent and proposed final judgment for consideration by Chief Judge Colleen McMahon on March 23, 2020. Chief Judge McMahon entered final judgment on March 25, 2020. As part of that final judgment, Bryan is permanently enjoined from engaging in securities

4

violations. Additionally, the SEC has initiated an administrative proceeding that will result in a bar from the securities industry.

On March 26, 2020 counsel received the final Pre-Sentence Report ("PSR"). Though we are in agreement with the Government and the Probation Department regarding the applicable Guidelines range, there remain several unresolved factual objections to the PSR (*see* section IV). While we believe that these objections to minor factual points do not impact the Guidelines calculation and, therefore, do not require an evidentiary hearing to resolve, we address them merely to provide the Court with the most accurate and comprehensive recitation of the relevant facts.

### III.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

Although Bryan's life has been defined by hard work, selfless acts, and a sincere devotion to family and friends, about five years ago, he regrettably made a series of critically poor decisions that bring him before this Court. Bryan wholly accepts responsibility for his conduct and does not attempt to make any excuses for it. We respectfully submit, however, that the context of his offense should be considered so that an appropriate sentence may be imposed.

In November 2011, Bryan attended an event organized by a Goldman Sachs corporate client. A supervisor and mentor of Bryan's attended the event and brought his close friend, Marc Demane-Debih ("Demane") as a guest.[3]   Demane introduced himself to Bryan (among others) as a successful businessman, not a trader, and the two exchanged a mere few words. Bryan and Demane crossed paths in at least one other social gathering alongside other Goldman Sachs employees between November 2011 and April 2013. On those two occasions, Bryan and Demane did not engage in any meaningful conversation.

---

[3] According to Demane's testimony in an unrelated criminal trial (*United States v. Lavidas*, 19-cr-716 (DLC) (S.D.N.Y.)), Demane's insider trading activity with Bryan represents a tiny fraction of Demane's 15 years of insider trading criminal activity (which, "in substance," he recognized having described to FBI agents as a "sport") and other criminal conducts (all of which were completely unknown to Bryan). Demane is a 49-year-old man who pled guilty to a 38-count indictment, consented to a 49 million dollars forfeiture (*see United States v. Demane Debih*, 18-cr-184 (VSB) (S.D.N.Y.)) and testified that he estimated to have profited nearly 70 million dollars in total from insider trading. He also described his prominent role as a member of a network of traders of insider information who corrupted financial news reporters, equity research analysts, board members and investment bankers, and year after year lied to national securities authorities in multiple countries, including the SEC, when they faced investigations. Additionally, Demane testified about his prior business activities which included a bankrupt company operating in the export of coffee from Africa to Europe, another bankruptcy related to exporting diamonds between Africa and Europe and an illegal cigarette smuggling business.

In the summer of 2014, Bryan and Demane attended the wedding of this same Goldman Sachs supervisor/mentor. At the wedding, Bryan and Demane socialized informally. At that time, Bryan was aware that Demane had been involved in a romantic relationship with a Goldman Sachs senior investment banker who attended the wedding and with whom Bryan worked.[4]   Although Bryan and Demane's interaction during the wedding was fairly brief, they enjoyed their time together and decided to connect when Demane would be next in London.

In October 2014, Bryan and Demane met for dinner and drinks in London as Bryan thought they were merely developing a social relationship. It was in this casual setting that Demane, apparently focused on Bryan's employment at Goldman Sachs rather than their burgeoning friendship, first attempted to recruit Bryan as a source of material non-public information ("MNPI"). As part of his inducement strategy to have Bryan provide him MNPI, Demane gave Bryan approximately $10,000 in cash and a burner phone. Bryan resisted Demane's initial effort at recruitment, threw away the phone and attempted to give back the cash, but Demane refused to take it back.

Over the next several months, Demane and Bryan met several times socially. At each encounter, Demane asked Bryan if he had "anything" (MNPI) for him. Although Bryan was constantly in possession of MNPI, he did not share any information with Demane.

---

[4]  Demane admitted to having stolen and traded numerous times on material non-public information from his girlfriend who worked in the Investment Banking Division of Goldman Sachs in a more senior position than Bryan. Demane testified he did so without her having knowledge of his conduct.

Eventually, in or about mid-2015, Bryan made the mistake of a lifetime by engaging in a course of conduct that undermined all that he stands for and worked so hard to achieve; namely, Bryan provided Demane MNPI that he obtained through his employment and did so in exchange for cash in violation of the law and Goldman Sachs policies.[5]

After this event in London, Bryan cut all contact with Demane. Bryan transferred to the New York office of Goldman Sachs in August 2017. When Bryan moved to New York, he had not spoken with Demane for more than a year, had not seen him in person since about late 2015 or early 2016 and purposely left without notifying Demane or providing him with any forwarding contact information.

Unbeknownst to Bryan, Demane learned of Bryan's transfer and figured out a way to contact him. Demane did not contact Bryan directly and instead used the relative of a Demane co-conspirator in an unrelated case to reach out to Bryan and provide him with a burner phone. After an undeterred Demane located Bryan in New York, Bryan regrettably exercised another lapse in judgment and used the phone to relay MNPI to Demane concerning the potential acquisition of Buffalo Wild Wings.

Following this tragic episode, Bryan made the honorable and character-defining decision to completely terminate his relationship with Demane and cease all criminal conduct by the end of

---

[5] As referenced in the PSR (¶16 & 17), Demane told Bryan that he would only use the MNPI himself and not pass it to others. This fact is crucial as Demane allegedly did, contrary to what he told Bryan, pass the information to others and reap significantly greater profits than Bryan could possibly have foreseen. Specifically, Bryan was not aware of and could not foresee the existence of Georgios Nikas ("Nikas"), referred to in the PSR.

2017—nearly two years before he was arrested. Bryan put an end to his transgression despite Demane's further attempts at contacting him, and despite having access to information about several deals that would have proven extraordinarily valuable to an insidious insider trader like Demane. Bryan did not make this decision because his conduct had been uncovered by law enforcement authorities; rather he made this decision out of an overwhelming sense of regret and wrongdoing, without any idea that he would one day be presenting this vital fact to a sentencing Court.

IV.     **UNRESOLVED OBJECTIONS TO THE PSR**

Consistent with the objections submitted to the Probation Department on March 13, 2020, in response to the draft PSR, as well as the description of the offense discussed in the previous section, a number of disagreements as to the PSR's factual allegations remain unresolved.

First, regarding paragraphs 13 to 15, we submit that the chronology of events is inaccurate. As outlined in our discussion of the facts, Bryan and Demane first met back in 2011. We also submit that at the wedding of their common friend in July 2014, Bryan and Demane did not have any meaningful conversation; there were no conversations about any kind of information Bryan had access to or any attempt from Demane to recruit Bryan as a source of MNPI. As in prior meetings, Demane presented himself as a successful entrepreneur, not a securities trader. Bryan had no knowledge of Demane's intentions and agreed to meet when Demane would be next in London as Bryan thought they were developing a friendship. It is during their subsequent meeting in October 2014 that Demane requested MNPI from Bryan. Bryan resisted this initial proposal as well as subsequent attempts by Demane for the following six months despite being in continual possession of MNPI.

Second, regarding paragraphs 15 and 16, it is imperative to reiterate that when Bryan relocated to New York in August 2017, he had not spoken with Demane for more than a year and purposely left without notifying Demane or providing him with any forwarding contact information as he had no intention to speak to him ever again. Moreover, when Bryan received an unsolicited phone call in September 2017, he had no idea who was on the other side of the line. Bryan never had any contact with Nikas nor did he know about Nikas's existence and involvement with Demane.

10

Furthermore, notwithstanding the claims in paragraph 17, cash was not stored in Bryan's parents' house nor did they ever have a safe in their house. Bryan's family, despite what the PSR would lead one to believe, had no knowledge whatsoever of his wrongdoing. Finally, Bryan never used any proceeds from this offense to purchase real estate in France.[6]   Accordingly, these factual allegations are untrue and have no basis other than Demane's extrapolation of the facts and, thus, should be rejected.

Lastly, on paragraph 57, Bryan's asthmatic condition is reported as "unverified." Additional supporting documentation of Bryan's medical condition is included in Exhibits 79–81.[7]

---

[6] *See* table attached hereto as Exhibit 83 showing that the total aggregate value of the properties when purchased was $507,000 of which $429,000 was funded by mortgages. Including the transaction expenses, the total down payment for the four properties was approximately $125,000 – an amount Bryan comfortably afforded with his income at the time.

[7] Other minor clarifications include: ¶ 19 (as per the trading records included in the discovery materials, Nikas's first trade in Syngenta took place on May 1, 2015; therefore no trades took place in April); ¶ 22 (as per the Background of the Merger section of the Definitive Proxy Statement of the Merger, at regularly scheduled Board meetings which took place on November 16 and 17, 2017, the Board of Directors of Buffalo Wild Wings directed Goldman Sachs to engage with a potential buyer's advisor and provide additional due diligence information. To the best of our knowledge, no decision to "move ahead with the acquisition offer" was taken on November 19, and 20, 2017); ¶ 69 (the first figure mentioned in this paragraph relates to Bryan's total compensation (salary plus discretionary bonus) for 2018, as opposed to "salary" (which is in fact the second figure noted in the same paragraph)); ¶ 70 (the total net worth does not reflect the payment of $260,000 subsequent to the preliminary order of forfeiture; furthermore, as mentioned in footnote 3, Bryan's net worth has been further reduced by an amount equivalent to four months of living expenses for Bryan and his partner in Manhattan without any income).

V.      **BRYAN'S PERSONAL HISTORY AND CHARACTERISTICS**

Section 3553(a) allows a sentencing court to consider a defendant in all of his unique humanity. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Because "*the punishment should fit the offender and not merely the crime," Pepper v. United States*, 562 U.S. 476, 488 (2011) (emphasis added), and given the extraordinary positive impact Bryan has had as a community member, a family member, a partner, a friend, and a mentor to so many others, we believe that the Court should grant a substantial downward variance from the applicable Guidelines range. Bryan's genuine goodness and kind-hearted nature shines through the close to 70 letters submitted on his behalf.

### A.     Bryan's Upbringing and Education

Bryan was born in 1986 in France, to Robert and Yaëlle Cohen, and he is the oldest of three brothers; Kevin and Greg are his younger siblings. Bryan was raised in a middle-class family and grew up in a small town, Saint-Raphaël. "Bryan and his brothers grew up in a modest home in which they were taught the meaning of moderation," says Bryan's aunt (Ex. 13, letter of Dominique Cohen Himy at 1).   Bryan and his brothers were provided with a "strict and disciplined" education from their father, who felt that "the more [he] pushed them, the more they would achieve their fullest potential." (Ex. 3, letter of Robert Cohen at 2).   "[T]he value of respect, family, tolerance, work, religion, sportsmanship and humility" was instilled in them. (*Id.* at 1).   Bryan's father was a

"very demanding man" whose "influence forged [Bryan's] resilience . . . and his great determination." (Ex. 52, letter of Carole Perez at 1).   Bryan's aunt adds that Bryan "always went above and beyond in his academic and athletic" endeavors to "never disappoint his father." (*Id.*).

As a child, Bryan was "very determined[,] disciplined" and "respectful of authority," remembers Bryan's cousin. (Ex. 51, letter of Stephanie Amar at 1).   "From an early age, Bryan showed signs of great intelligence and ability." (Ex. 11, letter of Andre Perez at 1).   In fact, Bryan skipped a grade when he was 6 and ranked consistently "at the top of his class" during his entire education. (Ex. 2, letter of Yaëlle Cohen at 2).   Bryan "had exceptional academic results, because he exerted considerable efforts to be the pride of his parents. All that Bryan has achieved is through his persistence, thoroughness, and discipline." (Ex. 52, letter of Carole Perez at 1).

Bryan was also an outstanding athlete; he played at competitive levels in multiple sports, and particularly excelled at tennis and golf. Bryan's uncle remembers that he "rank[ed] amongst the best French players in both [tennis and golf] at the age of 14." (Ex. 12, letter of Ariel Cohen at 1).   He adds that he has "always admired [Bryan's] strength of character, when other teenagers were playing PlayStation or were going to the movies on weekends, Bryan, for his part, worked, traveled all over France for . . . tournaments." (*Id.*).   Bryan "juggled top studies with high performance competitive sports," (Ex. 13, letter of Dominique Cohen Himy at 1) and at 16 years old, he "was selected by the national [golf] team to pursue a full scholarship sport-study program during his last year of high school." (Ex. 2, letter of Yaëlle Cohen at 2).   Bryan left his family home and went to Montpellier "to be able to study and compete with the elite athletes in his field." (Ex. 51, letter of Stephanie Amar at 2).   He became very independent and took "on responsibilities

that very few children of his age had to face." (*Id.*).   Bryan's roommate in Montpellier, Timothée Briset, who was also a student-athlete, recounts that Bryan "spent hours studying during evenings so [that] he [could] succeed in a professional career while all the other athletes played cards or video games." (Ex. 24, letter of Timothée Briset at 1).   He adds that "[s]tudying for hours at night is not an easy task, but studying when everyone else is doing other things shows how Bryan is someone who can stay the course." (*Id.*).   In 2002, Bryan was the number one French golf player in his age category and a member of the national team.

Although Bryan could have likely pursued a career as a professional athlete, he eventually devoted himself to academic studies. "It impressed me; it was a difficult decision for a young man to make. It showed how determined he was," tells Maurice Amar, Bryan's uncle. (Ex. 9, letter of Maurice Amar at 2).   Bryan entered scientific "Classes Préparatoires aux Grandes Ecoles (CPGE)," the most selective program in France post-high school. Through hard work and focus, in 2005, Bryan was accepted into the EDHEC Business School, one of the top Business School in France, renowned for its Finance program.   Bryan tutored countless children and teenagers after his classes and on weekends to pay for his own education, given his parents could not pay for school tuitions or expenses. "From the age of 16, and for many years afterwards, [Bryan] gave courses in Math, Physics, Chemistry, English, [and] French to other students, . . . to relieve his parents from . . . financial burden." (Ex. 12, letter of Ariel Cohen at 1).

"Bryan was one of the very few students to obtain a scholarship" and "the first one in [his] class to obtain an M&A internship," says Jonathan Wolff, one of his collegemates. (Ex. 17, letter of Jonathan Wolff at 1).   Bryan went on to complete three demanding 6-month internships in order

to maximize his chances to secure the best job possible after graduation. "But Bryan wasn't content by his own success, his focus was to help his close friends . . . get similar internships." (*Id.* at 1). Bryan spent time helping his friends prepare for their interviews, and they ultimately succeeded, "as a team." (*Id.*).   Bryan was a supportive classmate who pushed "many of [his] friends to work hard during [their] studies . . . to deepen [their] knowledge beyond the courses in the program," recalls another of Bryan's friends from college. (Ex. 25, letter of Benjamin Salah at 2).   Bryan "was spending time explaining corporate finance lessons to all of [his classmates,] . . . out of sheer generosity." (*Id.*).   Despite his busy schedule, Bryan was also involved in student organizations because "[h]e wanted to make a difference, improve the lives of all students and give everyone an opportunity to succeed." (*Id.*).

As Bryan's uncle, Andre Perez, summarizes: "[w]hile on the surface everything seemed to come easy to Bryan, for those of us close to him we knew that all his success came with hard work and dedication. However, despite all his accomplishments, Bryan always remained unpretentious and low key. His humility is one of Bryan's fundamental character traits." (Ex. 11, letter of Andre Perez at 1).

### B.    Bryan's Character and Values

People from different aspects of Bryan's life, from different backgrounds, sometimes separated by decades, addressed the Court to relate how Bryan positively impacted their lives. Family, friends, and work colleagues from around the world, expressed their impressions of Bryan and relay anecdotes that reveal his extraordinary character. In these letters, a few common themes clearly stand out.

Bryan is deeply committed to the welfare of his family and his partner, Olga. "Bryan's dedication to his family is second to none," says Bryan's cousin (Ex. 14, letter of Dylan Himy at 2).   Bryan "is generous in every sense of the word but most importantly with his time and unwavering affection for his family." (Ex. 8, letter of Sarah Amar at 3).   He has been a source of inspiration for his immediate and extended family, devoting himself fully to their happiness. He is a very loving, caring and supportive partner to Olga and has continuously supported his parents and his brothers through difficult times.

Bryan is a kind, generous and selfless person who has always put others first, investing himself fully to better the lives of everyone around him. "I have never seen Bryan depart from his kindness and care for others, from a generosity that is so ingrained in him," tells Jonathan Mrejen, one of Bryan's close friends. (Ex. 18, letter of Jonathan Mrejen at 1).   "Bryan is . . . the nicest and [most] unselfish human being one is blessed to come across. He always thinks of others' well[-]being before his own and always stands ready to help out when he is needed. He is a loving son, a supporting brother, a faithful friend and the one all his cousins look up to," relates Bryan's uncle. (Ex. 11, letter of Andre Perez at 1).   Bryan "has always been present for whoever needed his help; he has never turned his back on the needy," observes Bryan's aunt. (Ex. 6, letter of Valerie Perez at 1).   Bryan has been a devoted mentor to many, "[h]e is passionate about the development of those around him, and he always wants others to succeed, always thinking about how he can help people further themselves, irrespective of any impact on himself." (Ex. 19, letter of Stephanie Donaldson at 2).   Olga says that "[Bryan] cares about everyone, he never lives for himself but always to give happiness to others." (Ex. 4, letter of Olga Savina at 3).

16

Bryan does not come from a privileged background and his achievements have been the result of an exceptional work ethic. "[A]lthough he achieved great personal and career success, it didn't come from a place of privilege or arrogance. He worked immensely hard," says one of Bryan's ex-coworker (Ex. 32, letter of Hulisani Manyatshe at 1).   Bryan always remained humble and unmaterialistic. In fact, "his drive to succeed was always with the aim of doing good around him." (Ex. 11, letter of Andre Perez at 1).   "Bryan can't be farther away from the Wall Street cliché. He does not own fancy watches, does not drive a sports car, he is humble and positive person whose happiness is to spend quality times with his friends, colleagues and loved ones." (Ex. 26, letter of Guillaume Garin at 1).   "Bryan is a very humble man who does not live the life of luxury one might presume." (Ex. 21, letter of Karl Reed at 2).   "[Bryan] is from humbl[e] beginnings and is an incredible hard-working man that truly started at the bottom and had to earn the respect, his successes and accomplishments. . . . He is and always has been a simple person, never someone who needed to be in the spotlight." (Ex. 8, letter of Sarah Amar at 1–2).   As Bryan's father puts it best: "Bryan's story is the story of a boy who started from nothing, for whom nothing was easy, to whom nothing was given freely, and whom built for himself, all alone, by his will, sacrifices, courage, and unimaginable work ethic the life he had." (Ex. 3, letter of Robert Cohen at 2).

Finally, Bryan's conduct in this case is fundamentally offensive to his core values. The letters uniformly describe Bryan as someone with an acute sense of right and wrong, and as someone who, this case aside, exclusively chose the path of right. He "always conducted himself with utmost integrity." (Ex. 11, letter of Andre Perez at 1).   They also relate the shock and the deep sorrow they felt when they learned that Bryan fell on the wrong side of the law, on the wrong side of what is right, and that such was brutally out of character for the man they had known for decades.

17

"I can honestly say, hand on heart, that I was completely in shock to see [Bryan's] name associated with anything like this. I genuinely read the story several times in disbelief and can only liken it to receiving the unexpected news of the death of a loved one. This is so out of character for Bryan," says one of Bryan's friends. (Ex. 21, letter of Karl Reed at 2).   The letters also show the considerable toll and colossal ruination this case has brought on Bryan personally, his partner and his family. "[S]ince October 18, 2019, our life has come to a complete stop, our family has been shattered, our hearts are suffering a little more each day." (Ex. 2, letter of Yaëlle Cohen at 1). "[A]fter Bryan's arrest everything finished for us. It is a real nightmare. . . . The most positive person [] I know lost his reason. I can't see him like this," says Olga (Ex. 4, letter of Olga Savina at 3).   Maciej Jama, one of Bryan's friends from London who visited him in New York tells that he "could literally feel that the weight on [Bryan's] shoulders had already taken its toll to a crushing effect. The overwhelming sense of guilt was palpable." (Ex. 68, letter of Maciej Jama at 2).   As expressed in his own letter to the Court, Bryan is undeniably distraught and deeply remorseful for his actions. Although Bryan's conviction will stay with him for the rest of his life and his criminal case has ended a chapter of his career and life in the United States, his friends and family have no doubt that he will continue to contribute positively to society as soon as given the chance.

The testimonies in the letters submitted on Bryan's behalf really speak for themselves. They paint a vivid picture of Bryan's exceptional character; a kind-hearted, hard-working and humble man who is selflessly dedicated to the well-being of everyone around him.

### C.    Bryan's Dedication to His Family

Throughout his life, Bryan has always maintained very close relationships with his family members, both immediate and extended. His dedication to the well-being of his parents and his brothers resonates unequivocally in the letters submitted in support of Bryan. "[Bryan's] relationship with his parents and brothers is truly one of a kind. The respect and love he has for them is unique. Whether [Bryan is] in France, UK, USA or anywhere in the world, his parents and brothers are his top priority and he would drop everything if any circumstance was called for," says Kathy Amar-Perez, Bryan's aunt. (Ex. 55, letter of Kathy Amar-Perez at 1).   "[Bryan] grew up in a very tight knit family and has always been dedicated to his family's happiness and well-being." (Ex. 51, letter of Stephanie Amar at 2).

Robert and Yaëlle themselves relate how they have been cherished by Bryan. Yaëlle says:

When Bryan lived in London, he would come home every month, even though he had to work constantly during his visits. He was still there to steal simple moments of happiness between us, he always made time for us.

Bryan always made certain to involve me in his daily life. Despite the distance, and his frantic pace of work, he always found time to call me, he knew it made me happy. . . .

I often wondered if there were many children like mine who preferred to travel with their families rather than with their friends[.] Or, if there are many children[] who after each meal[] say thank you and kiss their mother[.] . . .

(Ex. 2, letter of Yaëlle Cohen at 3).

Robert also speaks about the critical support he received from Bryan when █████████ █████████, and Bryan's role as a mediator between Yaëlle and Robert for many years:

When Bryan was about 15 years old, █████████████████████████ My wife and I went through a very hard time for the following ten years, fighting and arguing

19

every day, at the verge of a divorce. I am not proud to say that Bryan ended up in
the middle of it all, far too young. Some nights he would even come and sleep with
me in the living room to hold my hand while I was crying and complaining about
his mother. I know it was an extremely difficult period for my sons and if it wasn't
for Bryan's patience and love for his family, my wife and I wouldn't be together
today.

(Ex. 3, letter of Robert Cohen at 2).

In 2011, when Yaëlle was diagnosed ████████████ Bryan (who had just started working

for Goldman Sachs in London) "worked from [her] hospital bed to stay by [his mother] day and

night" and "supported his brothers and father[,] who were sinking." (Ex. 2, letter of Yaëlle Cohen

at 3).   When  Yaëlle  miraculously  recovered  from  her  ██████████████████

██████████  and Bryan put all his heart into helping his mother resurface. He worked with her on

her "personal and professional reconstruction" for six years. (*Id.*).   "He wanted me to believe in

my dreams, he spent hours helping me set up a new project, he motivated me, reassured me to give

me hope for a better future. . . . [H]e was stealing time he didn't have. He was my savior!" (*Id.*).

Bryan is also deeply committed to his younger brothers' happiness and success. He has

always invested himself fully and lovingly in supporting their personal and professional growth.

"For Kevin and Greg, . . . Bryan is their best friend, their confident, their role model, their rock. . .

. He has always been there for them. Every steps of the way during their studies, he helped them

with homework, exam preparation, work internships, jobs and everyday life challenges. Kevin and

Greg don't turn to [Robert or Yaëlle] for anything, they turn to Bryan." (Ex. 3, letter of Robert

Cohen at 3).   Bryan "helped pay for his two brothers to go through college and assisted them

financially until they found a job." (Ex. 11, letter of Andre Perez at 1).

20

Since his arrest, Bryan's family has been shattered to the point that Bryan's parents' health has significantly worsened. His mother "barely eats and has lost 30 pounds," while his father ███████████████████████████████████████████ (Ex. 14, letter of Dylan Himy at 2).   Bryan's mother "started smoking again after stopping 11 years ago," and his father "█████████████████████████." (Ex. 2, letter of Yaëlle Cohen at 1).

Bryan is the cement of his immediate family and the pillar to his more extended family. Spending time with his loved ones and making sure they are cared for has always been Bryan's number one priority. He also shares very close relationships with all the members of his extended family, grandparents, uncles, aunts, and cousins, who Bryan dedicated himself to in the same altruistic way (developed further below).

### D.    Bryan's Exceptional Selfless Acts Towards Those in Need

The letters submitted on behalf of Bryan demonstrate his remarkable good and charitable deeds. Post-*Booker*, a defendant's history of charitable activities can be considered as one of the factors appropriate in imposing a sentence below the advisory guidelines. Notably, several courts have granted a defendant a variance or downward departure based on the defendant's "exceptional" good works. *See, e.g., United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (upholding the district court's downward departure where many of the letters supporting Serafini "contain[ed] substantive descriptions of Serafini's generosity with his time as well as his money"). As *Serafini* and other cases make clear, whether it is categorized as a downward departure or the basis for a non-guidelines variance owing to the 18 U.S.C. § 3553(a) factors, a life of extraordinary good works towards others remains a vital factor for a sentencing court to consider. *See, e.g., United States v.*

*Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation due largely to the defendant's "exceptional" charitable acts and good works); *United States v. Cooper*, 394 F.3d 172, 177-78 (3d Cir. 2005) (noting that "[d]ownward departures for good works . . . are permissible when the works are exceptional," and upholding the departure where the defendant's good works included "hands-on personal sacrifices, which have had a dramatic and positive impact on the lives of others").

Tellingly, many of the courts that have addressed a defendant's good works have recognized that the defendant's contribution of his time and energy is more valuable than simply his monetary contributions. *See, e.g., Tomko*, 562 F.3d at 572 (describing how the defendant's "charitable acts [ ] involved not only money, but also his personal time"); *Cooper*, 394 F.3d at 177 (noting that personal sacrifices "are qualitatively different from the detached donation of money"); *Serafini*, 233 F.3d at 775 (noting that Serafini's contributions "weren't acts of just giving money, they were acts of giving time, of giving one's self" (internal quotation marks omitted).).

Bryan's good works are truly exceptional both in terms of substance and scope. Despite a very demanding professional career, Bryan has always committed himself to helping family members, friends, acquaintances or simply anyone who needed him. Bryan's inclination is always to give—be it his time, his energy, his knowledge, his resources, or his compassion. He always puts others before himself. The letters of support provide a glimpse of Bryan's selfless acts of kindness:

- While Bryan's cousin, Sacha Himy, was in business school in Nice, France, he started ███████████████████████████████. His father was ████████ █████████████ and Sacha witnessed the terrorist attacks which occurred in Nice during the July 14, 2016, celebrations. (Ex. 5, letter of Sacha Himy at 2). "Bryan and his mother appeared to be the only people who would pay attention to [Sacha's] concerns without judging [him]." (*Id.*). Sacha was struggling to do anything other than staying in bed and

22

█████    Bryan then decided to invite Sacha to stay with him in London to help prepare him for his finals. "[Bryan] only put one condition to his help: [Sacha] to █████ █████, and [he] did!" (*Id.*).   Bryan did not only help him with Finance and Strategy lessons, he also "help[ed] [Sacha] with [his] insecurities, anxiety and fear from the outside world." (*Id.*).   As Dominique Cohen Himy, Sacha's mother, writes: "During this time, Bryan was the only person Sacha agreed to open up to. . . . Bryan never stopped believing in him, listening to him, encouraging him and helping him overcome his lethargic state." (Ex. 13, letter of Dominique Cohen Himy at 2).   Against all odds and thanks to Bryan, Sacha graduated from business school and no longer ████████   "It was the most unexpected victory, no one believed in Sacha, he didn't believe in himself anymore, but Bryan never wanted to abandon him." (*Id.*).   Sacha's brother, Rudy-Roy Himy plainly declares: "he saved my brother, Sacha, █████████████████  He didn't let him down. He understood what we didn't understand." (Ex. 60, letter of Rudy-Roy Himy at 2).

- When Bryan's aunt, Valerie Perez, got divorced six years ago, her ex-husband left her "struggling with 3 young children to provide for." (Ex. 6, letter of Valerie Perez at 1). She wrote that "it was extremely difficult, sometimes to the point where [she] thought [she] wouldn't be able to make it." (*Id.*).   Bryan supported Valerie and her three children "with his presence, his advice and his love," and "was there for [her] children . . . as they were trying to manage their anxieties going through their parents' divorce." (*Id.* at 1–2). Daniel Assayag, Valerie's eldest son, relates how, after his father "decided to stop being present in [his] life," Bryan "filled the role of a father figure for [him] for the past 6 years." (Ex. 7, letter of Daniel Assayag at 1).   Valerie also writes that when she was not "able to face [her] financial obligations" and "was going to get evicted from [her] home," "Bryan helped [her] pay [her] rent for over a year, which allowed [her] to get back on [her] feet." (Ex. 6, letter of Valerie Perez at 2).   She adds: "I wouldn't have been able to go through this period without [Bryan]. His kindness and generosity allowed me to stay strong, focused and most importantly keep my dignity." (*Id.*).   Bryan helped his aunt "without expecting anything in return, without bragging about it, he never made [her] feel lesser or that [she] owed him anything in return. He just wanted to see [her] and [his cousins] happy and secure." (*Id.*).

- Sarah and Stephanie Amar, Bryan's cousins, and their father Maurice Amar recount the pivotal role that Bryan played when, ten years ago, Judith, Bryan's aunt, was suddenly ██████████████████████████  Sarah writes that "[Bryan's] presence became invaluable to [her]." (Ex. 8, letter of Sarah Amar at 3).   She notes that Bryan was "[t]he first person [she] confided in," and "from that instant he became [her] rock." (*Id.*). Bryan researched himself "all the treatments available and all alternative routes [the family] could consider." (*Id.*).   Stephanie tells how "Bryan was the first one to offer his time and aid to make sure [Judith] received the best treatment possible." (Ex. 51, letter of Stephanie Amar at 2).   Stephanie relates that "[Bryan] visited [Judith] countless times to spend time with her by her bedside," and "always had the perfect gesture, or that funny story that kept her spirits high." (*Id.*).   As Sarah poignantly puts it: "He was my lungs

23

when I couldn't breathe, he was my brain when I couldn't think, and when she finally succumbed to her illness, he was my heart when I couldn't feel." (Ex. 8, letter of Sarah Amar at 3). After Judith's passing, Maurice "lived the life of a broken man." (Ex. 9, letter of Maurice Amar at 1). However, after a few years, he chose to remarry, and "this decision proved to be extremely difficult in many ways but mostly since [it] alienated [Maurice] from [his late] wife's family, [his] family." (*Id.*). At Maurice's second wedding, his relatives "decided that their presence would be too difficult and decided not to [attend]." (*Id.* at 1–2). Bryan "was the only one that traveled to attend [the] wedding and provided [Maurice] courage, love and support," he "was there every step of the way," and "was able to mend the relationship with [Maurice's] family members." (*Id.* at 2) (emphasis omitted).

- Jonathan Laloum, one of Bryan's closest friends and former roommate in London, enumerates several touching examples of Bryan's kindness. Jonathan used to  (Ex. 15, letter of Jonathan Laloum at 2). Bryan, who was living with Jonathan at the time, "was really upset" about the situation and "decided to get [him] out of this vicious circle." (*Id.*). One Saturday night, Bryan found out that Jonathan was ▮▮▮▮▮▮▮▮▮▮. Jonathan declares that "[w]ithout Bryan's help and support, [he] would probably have ▮▮▮▮▮▮▮▮ Bryan also showed his natural generosity when Jonathan's sister was in significant debt. Although she received some financial help from her family, she was "still short of a fairly significant amount to clear [her] debt." (*Id.*). Jonathan asked Bryan for help, and "his response was simply a straight 'of course, this is family'." (*Id.*). Although Bryan helped get Jonathan's sister out of debt, Jonathan's family does not even know about Bryan's kind gesture.

- Stephanie Donaldson, Bryan's ex-girlfriend talks about how, "years after [their] relationship had ended," "Bryan continued to support [Stephanie]" and "helped [her] through subsequent break ups, depressive episodes and work challenges." (Ex. 19, letter of Stephanie Donaldson at 2). She remembers "calling Bryan one day during working hours in tears and [Bryan] dropped everything" and arrived "with some lunch and a comforting ear to listen, returning to work only after he had made sure [Stephanie] was feeling better." (*Id.*). She says that Bryan would regularly make such gestures demonstrating "his kind, caring and selfless heart." (*Id.*).

- Another of Bryan's friends, Dionas Sotiriou, says that Bryan has been "an inspiration for [him] at key moments of [his] life." (Ex. 16, letter of Dionas Sotiriou at 1). Dionas recounts numerous instances of Bryan's positive contributions to his life. Particularly, when Dionas launched his company, he "naturally turned to [Bryan] for his opinion and guidance." (*Id.* at 2). "Bryan without hesitation took a lot of his time during weekdays and weekends to help [Dionas] even though [Bryan's] time [ ] was scarce." (*Id.*). Dionas

declares that Bryan's endorsement "was the main reason [he] found the courage to take a leap of faith and start [his] company." (*Id.*).   Bryan continued to offer "unsolicited help" to Dionas and, "[t]ill this day, [Dionas] would turn to [Bryan] for the most critical decisions regarding the strategy of [his] company." (*Id.*).   Dionas also explains that as he started his company, his means were limited and that, for two summers in a row, he could not afford to go on holidays with his close friends (including Bryan). He says that "in a completely unsolicited manner," Bryan insisted that Dionas joins and covered his expenses so that he "would not feel left out." (*Id.*).   He adds that Bryan's support went "beyond just the financial help" and "shows how Bryan never stops putting himself in other's people shoes to ensure everyone is happy." (*Id.*).

- Angela Pouza, an 86-year old lady who lived in Bryan's hometown in France, narrates the touching story of the special friendship she shares with Bryan. Thirteen years ago, when she was left alone by her ex-husband after 51 years of marriage, Angela was "in desperate need of support" and suffered from loneliness. (Ex. 41, letter of Angela Pouza at 1).   Bryan, who was then at college, "dedicated a lot of his time to [Angela]" and "did everything in his power to bring back [Angela's] smile so that [she] could be happy again." (*Id.*).   Bryan taught Angela how to live independently, he helped her purchase a car, he showed her how to use a computer, he encouraged her to join cultural associations, and was sometimes just reading Angela poetry to keep her company. Angela declares that Bryan "reawakened [her] taste for life" and for that "[Bryan] has a very special place in [her] heart." (*Id.* at 1–2).

- Jonathan Wolff and Bryan met on their first day at Business School, close to 15 years ago. He writes that Bryan "has supported [him] countless times during difficult periods and [he] would clearly not be the man [he] is today if [Bryan] wasn't in [his] life." (Ex. 17, letter of Jonathan Wolff at 1).   Particularly, Jonathan talks about "a very stressful period" in his life when his parents' business "started to face difficulties" and they had to sell their home. (*Id.*).   When Jonathan confided in Bryan about the hardship his family was facing, and although Bryan "was only an analyst and didn't have much money saved," he transferred to Jonathan "almost all his savings to help [him] until [he] could pay [Bryan] back." (*Id.*).   Jonathan emphasizes that Bryan "never boasted about how much he has done for [him]." (*Id.*).

- Othman Djouada relates how, about four years ago, Bryan responded to his unsolicited outreach in the context of his search for an internship. Othman was "an unknown young student" to Bryan who "had nothing to offer him in return," and simply "dreamed of working one day as an investment banker." (Ex. 42, letter of Othman Djouada).   Othman describes how, despite his busy timetable, Bryan "would always find the time to ask for an update of [Othman's] situation" and "helped [Othman] again and again" including in the context of the preparation of his Master Thesis. (*Id.*).   Bryan "taught [Othman] that to be successful [he] needed preparation first, and then hard work, abnegation, dedication." (*Id.*).   Othman also adds that he has "always been impressed by [Bryan's]

25

kindness, his generosity and his ability to give a hand to those who were fighting for their dreams, while expecting nothing in return." (*Id.*).

- Jonathan Mrejen, who has known Bryan for more than 10 years as a friend and as a work colleague, mentions that "there are many instances worthy to mention where [Bryan's] behaviour and his actions attested of the nobility of his heart and character." (Ex. 18, letter of Jonathan Mrejen at 1–2).   Particularly, he recounts an episode "particularly dear to [him]" as it pertains to a "difficult period in [his] life" (*Id.* at 2); Jonathan grew up as a traditional Jew and found himself in a difficult situation when he engaged in a serious relationship with a non-Jew, Elena. Torn between the pressure of his family and his sincere feelings for Elena, Jonathan sought advice from Bryan and "in him found a friend who was totally devoid of any of prejudice and was able to speak with his usual intelligence of heart." (*Id.*).   Jonathan says that "[m]ore than appeasement, what [Bryan] offered [him] was a way out of the dead end." (*Id.*).   Jonathan adds that "[i]t is in good part thanks to [Bryan's] counsel at that critical juncture that [he] resolved to take the hard path, help Elena with her conversion" to Judaism. (*Id.*).   Jonathan and Elena are now married and proud parents of an 18-month old boy.

- Pegah Esmaeili, one of Bryan's friends, writes that, within their friendship group, Bryan is the one people "go to for advice" whether "concerning work or personal." (Ex. 66, letter of Pegah Esmaeili).   When Pegah was headhunted for an exciting job opportunity in Paris, Bryan spent "hours and hours with [Pegah] preparing for the job interview." (*Id.*). "Bryan was the ONLY person" out of Pegah's large friend group "who took the time to be there for [Pegah] when [she] needed it most." (*Id.*).   Pegah ended up getting the job in the city of her dreams, meeting her husband there, and now has a 6-month old son. She says: "[a]ll of this would honestly not have been possible without Bryan – as he was there during a very stressful time in my life and without his support I would not have managed through the process." (*Id.*).

- Andre Perez, Bryan's uncle, states that "Bryan has been a great counsel to [him] and has always been there when [he] needed him." (Ex. 11, letter of Andre Perez at 2).   When Andre "had a difficult relationship with [his] son," Bryan gave him "precious guidance on how to best handle it." (*Id.*).   Furthermore, Andre "often relied on Bryan's wise recommendations for key strategic [business] decisions, which ultimately helped [Andre] improve significantly [his] company's operations." (*Id.*).   He concludes by saying that "[t]he world is a better place because of people as kind and considerate as Bryan." (*Id.*).

- Alexandre Catena, Bryan's closest friend in high school, explains how "meeting Bryan has been one of the best things that happened to him." (Ex. 23, letter of Alexandre Catena at 1).   When Alexandre did not have "any goals, discipline or self-control" and was facing difficulties at school, he used to react with "anger and violence." (*Id.*).   "Thanks to Bryan's positive influence," Alexandre became "more self-confident," he begun "handling [his] frustrations," and started "believing [he] could reach any objectives [he] would set [his] mind to achieve." (*Id.*).   Alexandre also tells the story of Eric, a "very shy

26

and geeky person" who was in their high school class and was "subject to constant mockeries" by his classmates. (*Id.* at 2). Bryan befriended Eric, and "helped him socialize with other people" by "inviting him to spend time with [Bryan's] group." (*Id.*). Thanks to "Bryan's kindness and genuine caring personality," Eric "socialized more and more with other students in [the] class, started focusing more in class and became a much happier person." (*Id.*).

- Benjamin Perez (Bryan's cousin) recounts many instances where Bryan had a positive impact on his life. Particularly, he observes that Bryan kept in close contact with Corinne and Ilan, Benjamin's father's second wife and their son, even after their divorce. He writes that "Bryan and his family became a huge support for [Corinne] when she ███████ ████████████████████" (Ex. 10, letter of Benjamin Perez at 2). Although Benjamin's father (Bryan's uncle) remarried a third time, Bryan stayed by Corinne's and Ilan's side during Corinne's illness. Benjamin writes that "[o]nce you enter Bryan's life, he would never turn his back on you regardless of the situation. He always invests himself fully regardless of blood lines or family ties." (*Id.*). Benjamin also explains that, thanks to Bryan's commitment to Corinne, "[he] was able to re-establish a relationship with [his] younger brother, one that [he] value[s] very much." (*Id.*). He concludes by saying that "Bryan's generosity and kindness have no ulterior motives other than making people feel accepted and needed." (*Id.*).

- Michel Abitbol, a family friend, writes about how he has been able to witness Bryan's altruistic nature on two separate occasions. When Michel sought advice with his business "[Bryan] recommended [him] reliable resources that assisted [Michel] in [his] business in the USA without any interest or expecting anything in return." (Ex. 43, letter of Michel Abitbol). Moreover, Bryan showed the same "generosity" when he helped the son of one of Michel's friends who was looking for a job. (*Id.*).

- Steve Cohen, who is the best friend of Bryan's youngest brother, "found in Bryan the big brother [he] always dreamed of having." (Ex. 49, letter of Steve Cohen at 1). Steve faced difficulties in his teenage years and was expelled from his high school which "led to a conflicting relationship with [his] parents." (*Id.*). Bryan took the time to listen to Steve, he tutored him in mathematics, and helped him find solutions to improve the relationship with his parents. Steve says that he "could never have resurfaced without Bryan's support." (*Id.*). He writes: "if Bryan had not been there for me in my moments of confusion when I was in high school, I would probably be the one who would need a letter of support today." (*Id.* at 2). Bryan "is the person who makes [Steve] feel that nothing is impossible and that with perseverance and work, [Steve] can do anything." (*Id.* at 1).

- Another meritorious trait of Bryan's character is his desire to bring people together to share special and joyful moments which Bryan clearly inherited from his warm and welcoming family that so many of his friends commented on. "No words can fairly describe the love and generosity of his family. Their modest home has always been the most welcoming place there is." (Ex. 15, letter of Jonathan Laloum at 3). Bryan "would

27

always be the first one to organize group events like drinks, dinners and Jewish
celebrations with all his friends, independent of their religion," says one of Bryan's close
friends and former roommate (Ex. 64, letter of Sezer Ozkul). "Bryan is the cornerstone
of our group, he always found a way to bring us together, being weekend soccer matches,
basketball games, social evenings or shabbat dinners." (Ex. 15, letter of Jonathan Laloum
at 1). "When Bryan decided to move to New York . . . [he] left a rather big void in our
tight knit friend group. A bit like the centre of gravity just left." (Ex. 20, letter of Eva
Kortekaas at 2). Guillaume Garin remembers a "special moment" which "perfectly
illustrates Bryan's personality." (Ex. 26, letter of Guillaume Garin at 1). He recounts that
"[w]hile [he] was travelling in the South of France a few years ago (and at the time not
particularly close to Bryan), [Bryan] invited [him] to spend a Shabbat with his family.
[Guillaume is] not Jewish, had never met [Bryan's] family, but Bryan made [him] feel
like [he] was at home. . . . [Bryan] . . . will integrate 'outsiders,' just like he did when he
invited [Guillaume] for a Shabbat." (*Id.*)

As reflected in these myriad acts of kindness, Bryan never expects anything in return for his

help. Giulio De Angelis, a friend of Bryan's youngest brother, summarizes it well in his letter:

"[w]hy did Bryan help me? I didn't have anything to give him in return, I was not family, not even

Bryan's friend at the time, I was just his youngest brother's friend. I later understood that Bryan

always puts others first. He doesn't want to take credit, he just simply wanted me to succeed and

he knew he could help, so he did." (Ex. 48, letter of Giulio De Angelis).

Bryan's good deeds have involved his time and effort and not only his money. Furthermore,

as just a few of these personal vignettes demonstrate, Bryan's charitable acts have been exceptional

and extensive in scope, manifested by close to 70 letters detailing how Bryan's acts of kindness

have impacted positively countless people.

### E.    Bryan's Professional Career

Helping entrepreneurs and corporate managers make the right decision for their company's

future was a job particularly well suited to Bryan's personality and skills. As someone who cares

28

deeply about others, Bryan was immediately drawn to the profession and dedicated his entire professional life to giving the best possible advice for companies and employees to thrive. Hali Borenstein, the President of a direct-to-consumer company who worked closely with Bryan in 2019 relates:

> [Bryan] proved himself to be an outstanding partner and thought driver. Throughout the nine months I worked with Bryan, he was an incredibly supportive and thoughtful counterpart. While I had many questions and concerns, Bryan was always extremely positive and helpful. His extensive experience helped to shape our communication to financial partners. He was a confidant for our team during this time and we would not have had such a positive outcome without his guidance. I should also mention that I had my second child just prior to our project and was balancing the demands and stresses of motherhood with those of the financial transaction. Bryan was always very sensitive to my needs as a mother and went out of his way to ensure I could be successful in both my personal and professional capacities. . . .

> In my experience, Bryan's work ethic and diligence exceeded the vast majority of the people I worked with during my consulting experience and at subsequent jobs. Bryan would work late into the night to make sure we had what we needed to be successful the next morning. . . . He is extremely diligent because he knows that such attention to detail will ultimately produce a better result for his clients. . . .

> Ultimately, with Bryan's guidance, we had a great outcome and were able to find the perfect partner for our next stage of growth.

(Ex. 29, letter of Hali Borenstein at 1–2).

The road that led to Bryan's position at Goldman Sachs was not effortless. In fact, prior to obtaining a full-time analyst position at Goldman Sachs, Bryan worked extremely hard to complete three 6-month internships in Paris while obtaining an MSc in Corporate Finance degree, graduating top of his class and paying for his own education.

Bryan's career at Goldman Sachs was marked by relentless hard work and countless sacrifices. Bryan has been working 80–100 hours per week minimum during his entire career.

Bryan's mother writes that Bryan "loved his job, his colleagues and his numerous mentees." (Ex. 2, letter of Yaëlle Cohen at 2).   She adds: "[o]ften, [Bryan] would call me at 6 a.m. and I would say, "Why are you up so early?" he would answer "No mom, I haven't slept yet, I worked all night…"." (*Id.*).

Hedi Ben Salem, a close friend since college, "can only echo the fact that [he] ha[s] been one of many direct witnesses of [Bryan's] hard work and sacrifices." (Ex. 62, letter of Hedi Ben Salem at 2).   He adds that "[he] can confidently say that out of all the people [he] know[s] working in Finance, including [him]self, Bryan was the most focused and passionate person." (*Id.*).

His determination and drive never faded away. Bryan's partner, Olga, who has lived with Bryan for the past two years, perhaps best sums up his devotion to his job:

> Bryan is fanatic of his job, he loves and he lives with his profession. I can say that because I see Bryan every day working nonstop. Waking up in the night, I find him sleeping on his laptop so many times. He devoted himself to his work.

(Ex. 4, letter of Olga Savina at 2).

After starting his career in the Mergers and Acquisitions division of Goldman Sachs' London office in 2010, first as an analyst and then as an associate, Bryan accepted the challenge to move to South Africa in 2013 for a one-year rotation in order to help the team in Johannesburg which was experiencing a large volume of transactions and needed help with training new hires. After a very enriching year, Bryan returned to London in mid-2014 and became Vice President in January 2016. In August 2017, Bryan realized his dream and moved to New York.

From Bryan's first internship at Natixis in Paris, where his supervisor relates today that "more than 10 years later, I can tell you Bryan still is the smartest professional I have ever worked with." (Ex. 35, letter of Yoni Ammar at 1), until the end of his career at Goldman Sachs in New York, the quality of Bryan's work and his team player attitude was undeniably recognized by all.

Alexander Verbitsky who was a more senior member of the team and sat next to Bryan for three years in London remembers that: "Bryan stood out with his leadership skills and overall maturity." (Ex. 38, letter of Alexander Verbitsky).   He also adds that: "[e]very project team wanted to have him because not only he was a brilliant analyst but also true team player." (*Id.*).

Siddharth Malik who was Bryan's superior for about three years recalls "being immediately drawn to Bryan because of his incredible work ethic, dedication to the job and positive "can do" attitude. (Ex. 36, letter of Siddharth Malik at 1).   He also notes that Bryan "was one of the brightest analysts in our team." (*Id.*).

Eric Hamou, a senior investment banker in Goldman Sachs' Paris office, recounts:

Of course, [Bryan] was intelligent, dedicated and hard working as most if not all the junior people at Goldman Sachs were but it is his maturity and quality of judgment which impressed me the most. We had difficult judgment calls to make and advice to give and whilst I was a Managing Director and him an Analyst, he was always willing to participate in the making of those decisions with great integrity in mind in his advice.

(Ex. 37, letter of Eric Hamou).

Chloe Baker who worked very closely with Bryan after his transfer to New York writes:

Out of all of the Vice Presidents, he was typically at the office working the latest with his teams. Regardless of the context of the materials we were creating (whether a live transaction or a client service meeting), Bryan was always focused on creating

the best output for our client and was detail-oriented, math-oriented and creative in his work. His reputation has always been outstanding, and he was considered one of the very best at his level of seniority with tremendous potential in his career going forward.

(Ex. 34, letter of Chloe Baker at 1).

Bryan was terminated by Goldman Sachs in December 2019 as a result of the instant offense, and while he was still a relatively junior member of his team, his career trajectory was certainly very promising.[8]  He was a remarkably talented, smart and hard-working person who always put the team's interest before his. Today, he has lost a profession he loved where his altruistic nature was driving him to do his best for each and every client.

### F.    Bryan Has Been a Passionate and Devoted Mentor to Many

One of the most striking features of Bryan's personality, in both his personal and professional life, is his passion for teaching, mentoring and helping others in any way he can. As evidenced by the letters of support, Bryan has been a source of guidance and inspiration for many people, from different backgrounds, and at different stages of his life. It is with the same humble and selfless nature that Bryan mentored and supported the development of his colleagues.

---

[8] Bryan worked in the Investment Banking department of Goldman Sachs primarily focusing on Mergers & Acquisitions. Contrary to what could be observed in the Securities division of an investment bank where traders in their early thirties can assume senior positions, at 33 years old, at the time of his termination, Bryan was not a senior or "high-level" executive. At the time of the offense, Bryan was a junior investment banker. He was an associate / junior Vice President, which is a relatively junior position in Investment Banking. Managing Directors (12-20 years of experience) and Partners (20 years plus of experience) are the senior investment bankers responsible for handling client relationships. There are currently approximately 15,000 Vice Presidents at Goldman Sachs.

"Bryan brought the same generosity and altruistic nature to the workplace and in that I believe he really stood out from the lot" commented one of Bryan's friends and ex-colleague when referring to the qualities he observed in Bryan's personal life. (Ex. 18, letter of Jonathan Mrejen at 2).   He added that "Bryan made it a point to show that one could be driven and successful and at the same time care for the people around him, inquire about their well-being, offer his help. It is no surprise that new joiners and junior bankers particularly liked working with him over anyone else. His generosity was almost proverbial." (*Id.*).

Siddharth Malik remembers that "what really made [Bryan] standout was his warm nature, team player attitude and his genuine desire to always help others. I recall many instances of Bryan choosing to sacrifice hours of precious sleep to stay back at work and help teammates." (Ex. 36, letter of Siddharth Malik at 1).   The letters of support from Bryan's ex colleagues are replete with examples of Bryan mentoring, nurturing, and supporting his colleagues and friends in their careers.

Vikas Bathla, an analyst who first started in the Bangalore office of Goldman Sachs in India, recalls that "[Bryan] had a reputation to be outstanding at teaching, mentoring and conveying his passion for the job to junior people." (Ex. 30, letter of Vikas Bathla at 1).   He also explains how, coming from a "humble background" in India, the opportunity of getting awarded a transfer to the London office of Goldman Sachs was "life-changing" for Vikas and his family. (*Id.* at 2). Understanding what was at stake for Vikas, Bryan trained him "twice as hard as anybody else," and pushed for him to achieve his "life-changing goal." (*Id.*).   He recounts:

> I grew up in a modest home and the prospect of working for Goldman Sachs in London was life changing to me. Bryan heard me loud and clear and made me work twice as hard as anybody else in the Bangalore office. He stayed much later at night than he had to and worked with me over the weekends when he didn't need to be in

the office. He invested in me, cared about my success, and my life-changing goal…
and we did it! . . . I can't think about any other person at Goldman Sachs or any other
companies I worked for in the last 13 years who invested in me and cared for me as
much as Bryan did.   (*Id*. at 2).

Uri Zahavi who started as a summer associate intern in London describes how Bryan taught

him the job and supported him to succeed in his internship in order to receive a full-time job offer:

> Bryan took me under his wing and taught me everything there was to know about
> the finance world and how to survive and even excel at a huge place like Goldman
> Sachs. This was not trivial as he was much younger than me in age but much more
> experienced. We spent days and nights together, working on some of the most
> interesting and complex transactions in the world. I got to know Bryan personally,
> learned about his upbringing, how close he was to his brothers and how he worked
> so hard his whole life to get to where he was. When you spend so much time with
> someone in intense and stressful situations you get to know the real person, no time
> or energy for walls. Thanks to Bryan and his efforts I got the full time offer to return
> to Goldman Sachs after I completed my MBA, which I happily accepted. . . . Bryan
> was always there when I needed some advice - professional or personal - and helped
> me navigate my career to reach my full potential. I was always surprised about how
> much wisdom that young man had and how dedicated he was to his job and
> teammates.

(Ex. 31, letter of Uri Zahavi at 1).

Alexander Verbitsky writes that he "will always remember" that "when Goldman Sachs was

administrating program for interns with underprivileged background," and that "[o]ne gentleman

from this program" who "grew up in a refugee camp in Africa" was placed in their team, "Bryan

spent more time tutoring and coaching this person than anyone else on [their] office floor." (Ex. 38,

letter of Alexander Verbitsky).

Bryan continued to have the same positive impact on his colleagues during his one-year

rotation in the Johannesburg office between 2013 and 2014. Rajiv Daya, an analyst at the time,

states that Bryan "played a pivotal role in mentoring [him]." (Ex. 33, letter of Rajiv Daya at 1).   He

remembers how Bryan "assisted [him] during key periods in [his] professional development at [Goldman Sachs]," and that he "learnt a lot from [Bryan] about professional conduct, client management and creating an inclusive work environment." (*Id.*).

Bryan's dedication to help people achieve their goals in a very inclusive manner is well explained by Hulisani Manyatshe who worked with Bryan in Johannesburg:

> He invariably became the older brother to many who have crossed his path. He was a place for both young and old, including partners, directors and CEOs to source wisdom and guidance when they required it. As an analyst that worked with Bryan, I received a lot of help and guidance in the formative years of my career and these have been key to my success today. . . . Bryan, being a Caucasian French man and myself being a gay, African Venda man, meant that we had very few cultural similarities besides the fact that his Jewish name, Yehuda, and my Venda name both meant praise/d. This did not prevent Bryan from being open to supporting my dreams and being invested in my career. . . . He respected, celebrated and accepted me with my many diverse facets. He never left anyone behind.

(Ex. 32, letter of Hulisani Manyatshe at 1).

Bryan also became a mentor to many more after he moved to New York. Chloe Baker relates how "[Bryan] ensured that [she] knew [she] was always welcome to step into his office and discuss whatever was on [her] mind - be it work-related or personal." (Ex. 34, letter of Chloe Baker at 1). Even after Bryan learned that Chloe would be moving to a different firm, "he continued to mentor [Chloe] and show [her] friendship demonstrating how much he cares about the bonds he shares with colleagues and friends, regardless of where they plan to forge their careers." (*Id.* at 1–2).

In both his personal and professional life, Bryan has always put others before himself, trying to improve the lives of those around him. His love for teaching, mentoring and helping people is ingrained in him. Despite his relatively young age, he has nurtured and motivated countless family

members, friends, students and colleagues. Bryan never did so for his own benefit, he never sought any credit or accolades. He is a genuinely selfless and caring person whose greatest pleasure is to help people achieve their goals.

### G. Bryan Provides Critical Support to Olga, His Partner

Bryan's partner, Olga, was an only-child raised in Moldova by her grandmother from the age of 6 when her parents got divorced. Olga's father moved to Russia while her mother moved to Romania and started a new family. Olga was abandoned by her mother when she was 14 and her father passed away two years later. When her grandmother died six years ago, Olga was left with no family and no money. In January 2018, after years of hard work, Olga saved enough money to realize her dream and moved to the United States. Bryan and Olga met in May 2018 and have been inseparable ever since, living together since shortly after the start of their relationship.

Olga found in Bryan her "soulmate, [her] partner, [her] support, [her] help in this big world, [her] friend for a life." (Ex. 4, letter of Olga Savina at 1).   Bryan is Olga's "home" and "family," the person that "God sen[t] [to] [Olga]" after "taking everything [away] from [her]." (*Id.* at 3). With Bryan, Olga has "started a new life," and is "very near to [her] childhood dream to build [her] own beautiful and strong family." (*Id.*).   Viktoria Felchle, a friend of Olga and Bryan who has observed their relationship from the beginning, says:

> Bryan made Olga trust again, love, live life with a smile on her face and an open heart and soul. They found a home in each other. The respect, values and support they share is unbelievable. Their relationship is based on pure love, affection and devotion. They should be a prime example for every couple, they are definitely one for me. I wish for every single person in this world to experience something close to what they have. . . . [Olga's] biggest wish is to have children, a functional, loving family with the love of her life, Bryan Cohen.

36

(Ex. 46, letter of Viktoria Felchle at 1).

Bryan has always supported Olga's goals and empowered her to achieve them. As expressed by Olga in her poignant letter, Bryan is an extremely caring and loving partner. Particularly, Bryan has made one of the most profound impacts on Olga's life by helping her overcome her pain and reconnect with her mother:

> Bryan helped me free myself from the pain that I kept with me for many years, living with hate and anger towards my mom for abandoning me when I was 14 and never coming back. I always find so painful all the stories about parents. I always felt ashamed and confused about her decision to leave me? Why me? Why I can't be the happy kid with two parents like all normal families? I live in fear that I would always be alone or that when I love someone so much, they will leave me? No one ever helped me find answers to these questions, no one has time for my pain. Bryan Cohen is the person that God send me. I never met a person who is that connected with his Mom and family. He is my example. And he is the one who supported me and pushed me to reconnect with my Mom. And I called her. Your honor, maybe for someone it is easy to call, but not for me, I will never be able to find the courage to do it if Bryan didn't help me. I have been for 16 years without mother love, even if I was angry at her, I missed her so much. Now she lives in Iran with my two half-sisters. I still didn't see her. But Bryan promised me that one day we will see her together.
>
> From Bryan I understand for real how important it is to forgive her and start to love her again. Because family is the most important. From here I started to believe that life can be beautiful, and I deserve to be happy. I grow up with a big dream, and this dream is to build my own family, raise kids, have a big round table for everyone, and never leave them no matter what.

(Ex. 4, letter of Olga Savina at 1–2).

Despite the trauma of Bryan's arrest and the fact that Olga and Bryan had to forget about their goals, their dreams, and the life as they knew it, Olga stood by Bryan's side during this terrible ordeal. But Bryan's absence from Olga's life would literally ruin her:

> I don't have anyone, I don't know how to leave without Bryan, how to be back to the empty house or even where to live. I can't stop crying and I can't describe my

feeling. I just felt again back when I was 14 years old when my mom left me alone. And now I'm 30 years face to face with my fear waiting for my sentence. (*Id.* at 3).

Olga's means are very limited and her ability to remain in the United States without Bryan's support is at best uncertain.[9]  Olga has also been recently ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ Bryan is the only person who can support and care for Olga, he is the only family she has, and undeniably, Bryan's absence would have tragic consequences for Olga.

---

[9]  Olga's O-1 visa expires on November 24, 2020.

## VI.   **RELEVANT SENTENCING FACTORS**

### A.   **Our Proposed Sentence Is Sufficient to Provide a Just Punishment**

In view of the unique factors in this case, we respectfully submit that a sentence of time served and two years of supervised release which includes a special condition that Bryan performs very substantial community service of 2,000 hours is sufficient but not greater than necessary and fully satisfies the objectives of 18 U.S.C. § 3553(a).

*Bryan's Personal Characteristics and Nature and Circumstances of the Offense.*   Bryan understands fully that he stands convicted of a serious offense for which he is profoundly remorseful. He acted against his principles and has promptly accepted responsibility for his crime. Bryan's conviction is and will forever be an anomaly in his otherwise exemplary life defined by extensive selfless acts, an unwavering dedication to family and friends, and an exceptional work ethic. His voluntary cessation of all criminal activities two years before his arrest speaks volumes about how his unlawful conduct was offensive to his core values.

*Punishment.*   Our proposed sentence is sufficient, but not greater than necessary, to achieve the sentencing goals of just punishment for several reasons.   First, our proposed sentence would significantly restrict Bryan's liberty and commit him to significant community service. Second, Bryan has endured and will continue to suffer severe collateral consequences: (i) he has lost his job at the only firm he had ever been employed and can never again work in his chosen field; (ii) he will be deported from and inadmissible to the United States where he and his partner intended to raise their family; (iii) he and his family have been publicly humiliated and Bryan's reputation is ruined; and (iv) Bryan has been under home detention with no opportunity to obtain

39

gainful employment for seven months while also being separated from family.   Third, a term of incarceration in the United States would be unnecessarily harsh given the inequitable treatment in custody that Bryan would receive as a non-citizen and the serious health risk that imprisonment would pose to him given the combination of his asthmatic condition and the unprecedented global pandemic which is materially affecting the functioning of our prisons.

*Deterrence.*   Our proposed sentence is also sufficient to achieve the sentencing goal of deterrence. In this case, there is simply no risk of recidivism. Because of his conviction, Bryan will be permanently barred from and effectively unemployable in the financial industry in the United States and abroad. With respect to general deterrence, that goal has been achieved by the significant publicity around Bryan's arrest, indictment, and guilty plea. The public would not look at Bryan and see anything but the devastating potential consequences of engaging in similar behavior considering the criminal prosecution he has been subject to and the collateral consequences of his felony conviction.

*Proportionality.*   A non-custodial sentence is warranted to avoid sentence disparities between similarly situated individuals. Probation sentences for conduct similar and sometimes more severe than Bryan's have been routinely imposed in the district. A custodial sentence would only compound this potential inequity when considering the adverse and disparate custody treatment that Bryan would receive as a non-citizen if sentenced to any term of incarceration in the United States. In fact, any time in prison would be significantly longer, more restrictive and served in much harsher conditions than a similarly situated U.S. citizen.

All the relevant sentencing factors militate strongly in favor of a non-custodial sentence, which will allow Bryan to use his energy and skills to be a productive member of the community while repaying his debt to society. Under these circumstances, we respectfully request a sentence of time served and two years of supervised release which includes a special condition that Bryan performs 2,000 hours of community service, equivalent to a year of full-time unpaid work. Such a sentence is sufficient but not greater than necessary and fully satisfies the objectives of 18 U.S.C. § 3553(a). This fair and just sentence would achieve something beneficial for the community and the underprivileged children that Bryan would dedicate himself to nurture. It is also the most humane sentence considering the unnecessary and serious health risk that imprisonment (of an asthmatic, deportable, non-violent, first-time offender) would pose to Bryan and the community at the time of an unprecedented global pandemic.

Furthermore, should the Court conclude that some measure of confinement is necessary to achieve just punishment, a special condition of home confinement would satisfy this objective without endangering Bryan's health and the community.

### B.   The Advisory Guidelines Do Not Properly Reflect the Degree of Bryan's Culpability

As the Court is aware, the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), rendered the Sentencing Guidelines merely "advisory." *Id.* at 245. The Supreme Court has since reemphasized that the Guidelines are not even to be presumed reasonable: "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.

. . . The Guidelines are not only <u>not mandatory</u> on sentencing courts; they are also not to be <u>presumed</u> reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (citations omitted).

In this case, the plea agreement between the parties stipulates a total offense level of 19 (after acceptance of responsibility) and a criminal history category of I (no prior criminal history) which corresponds to a Guidelines range of 30 to 37 months' imprisonment. The Guidelines analysis here, however, demonstrates an oft-criticized aspect of the Guidelines. As many courts have emphasized, the unreasonableness of the Guidelines is particularly evident when addressing the Guidelines' loss enhancements, which are "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004); *see also, United States v. Faibish*, 12-cr-265, 2015 WL 4637013, at 2 (E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated into the current Sentencing Guidelines regime."); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (describing the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss"*).* Specifically, the Guidelines vastly overstate the culpability of fraud offenses with, at times, arbitrarily high loss amounts, such as Bryan's offense. Indeed, the Guidelines loss table (U.S.S.G. § 2B1.1(b)(1)) is "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013).

Here, a 12-level loss enhancement dramatically increases Bryan's Guidelines range. Per the parties' Guidelines calculations, the loss enhancement increases Bryan's Guidelines range from 0–

42

6 months (Level 8) to 30–37 months (Level 19), a more than 1,000% increase from the middle of his range. Consequently, given the significant, irrational effects of Bryan's loss enhancement, this Guidelines range should be accorded little deference. Although this Court must look to the Guidelines as a "starting point," we pray that Your Honor will agree that a level 19 is draconian under the facts of this case, as to this defendant and, accordingly, when deciding on the degree of variance to impose, that Your Honor will temper justice with mercy and impose a punishment not greater than necessary to meet the ends of justice.

### C. A Non-Custodial Sentence Would Adequately Reflect the Out of Character Nature of the Offense in Light of Bryan's History and Characteristics

As described in the Personal History and Characteristics section, *supra*, and the numerous letters submitted herewith, the outpouring of emotions, and testimonies from the people who know Bryan best, speak to a truly caring man who has lived his life selflessly with an exceptional dedication for the happiness and well-being of his family, his friends, his former colleagues and others around him. Bryan comes from humble beginnings and his achievements have been the result of his consistent hard work. Bryan is a good person with a big heart who, despite his relatively young age, has done an incredible amount for the people in his life and the community at large. This conviction truly is and will forever be an aberration in Bryan's otherwise exemplary and law-abiding life.

The out of character nature of Bryan's offense is echoed by each and every one of the people who Bryan has come across, "[t]o say that i[t] has been out of character is to say nothing," says Maciej Jama, a friend of nearly 10 years. (Ex. 68, letter of Maciej Jama at 2).   Dionas Sotiriou, a

43

close friend of Bryan observes that "[t]hese actions are completely out of character for Bryan who was conducting otherwise an exemplary life. As contradictory as it may seem, Bryan absolutely loved his job and took pride in working his hardest for Goldman Sachs." (Ex. 16, letter of Dionas Sotiriou at 2). Similarly, Bryan's former colleagues paint the same picture: "[t]his action is not consistent with who he is and will forever be an anomaly from a respected individual who was known to have an inspiring career trajectory, a humble soul, a selfless demeanour and a generous spirit to many that he has come across in Africa, Europe and the United States." (Ex. 32, letter of Hulisani Manyatshe at 2). "[Uri] truly believe[s] that Bryan's mistake doesn't represent his true character and values. [Uri] know[s] him, the way soldiers know each other, and have nothing but great respect for [Bryan] despite this unfortunate mistake." (Ex. 31, letter of Uri Zahavi at 2).

The numerous meaningful testimonies recounted in those letters show how Bryan has touched the lives of virtually everyone he has met, whether a childhood friend, a college friend, a sports teammate, a work colleague, a student, or a client.

It is a tragedy that the unequivocal goodness that has been Bryan's life to date is recounted in a memorandum in advance of his sentencing in a federal courtroom, but "surely, if a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513. Bryan's history and characteristics are truly remarkable and militate strongly in favor of a non-custodial sentence, which will allow him to use his energy to be a productive member of the community while repaying his debt to society.

**D.    Bryan's Role in The Offense as Well as His Voluntary Cessation of All Criminal Conduct Two Years Before His Arrest Supports Leniency**

First, and particularly relevant to this case, the Supreme Court in *Gall* found that "[t]he District Court quite reasonably attached great weight to the fact that Gall voluntarily withdrew from the conspiracy after deciding, on his own initiative, to change his life. This lends strong support to the District Court's conclusion that Gall is not going to return to criminal behavior and is not a danger to society. *See* 18 U.S.C. § 3553(a)(2)(B), (C). Compared to a case where the offender's rehabilitation occurred after he was charged with a crime, the District Court here had greater justification for believing Gall's turnaround was genuine, as distinct from a transparent attempt to build a mitigation case." 552 U.S. 38 at 56–57. The Court also noted that the District Court, in imposing a three years' probation sentence in this drug case, acknowledged that "[i]n fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life." *Id.*, at 44–45. Bryan, understanding the harmful effect of his transgression, and knowing that he acted completely against his values and principles, ended his association with Demane and stopped all criminal conduct years before his arrest.[10]

Additionally, while Bryan does not seek to shift the blame for his conduct to anyone, it is uncontested that it was Demane who lobbied and pursued Bryan for tips. To be perfectly clear, there are no excuses for Bryan's conduct and he does not try to find any; but we respectfully submit

---

[10] *See also United States v. Howell*, 412 F. App'x 794, 795 (6th Cir. 2011) ("[W]hether or to what extent Howell withdrew from the charged criminal activity prior to his arrest [is] a potentially mitigating act."); *United States v. Sayad*, 589 F.3d 1110, 1119 n.6 (10th Cir. 2009) ("Sayad's argument would be more compelling if Sayad had begun his rehabilitation before his arrest.").

that understanding the context and the person who the offense was committed with is crucial in this case. As Bryan puts it in his own heart-felt letter to the Court: "The situation I put myself in is entirely my fault. I should have known better, been better, been smarter, but I was weak. . . . I completely lacked judgment and failed miserably on the principles and values I stand for." (Ex. 1, letter of Bryan Cohen at 1).

### E.   Bryan Has Promptly Accepted Responsibility and Is Deeply Remorseful

Bryan takes complete responsibility for his criminal conduct, he is deeply remorseful for having acted against his values and the law, and undoubtedly understands the seriousness of his offense and the harm he has caused to the integrity of the financial markets. Bryan betrayed his own principles and the trust that his employer had put in him. His withdrawal from criminal conduct nearly two years prior to his arrest, his early plea, his settlement in the parallel SEC matter, and full satisfaction of his forfeiture obligation prior to sentencing are tangible evidence of Bryan's contrition and acceptance of responsibility.

As Bryan expresses, he is "disappointed, ashamed and angry with [him]self." He has been "deeply regretful for a very long time now, not only since [his] arrest," and has lived with this "heavy burden of guilt ever since." (Ex. 1, letter of Bryan Cohen). Bryan also feels pain from hurting and disappointing the people he loves the most, and, in his own words, "will struggle to ever forgive [him]self for putting them through this terrible ordeal." (*Id.*).   Bryan wishes "there was a way to fix things," he hopes "not to lose the love and respect of [his] loved ones," and promises that despite the fact that "[t]his conviction will stay with [him] for life," "it will not define who [he is]." (*Id.*).   As Olga summarizes it in her letter: "Bryan lost his dream, his work, his

passion, all his money, his name, our plan to build a family and get a green card, raise our kids here in the USA." (Ex. 4, letter of Olga Savina at 3).

Bryan's family and friends have witnessed his remorse and contrition. Bryan's mother, who has moved from France to support Bryan and Olga through this ordeal from October 2019 until February 2020, has "see[n] him agonize with remorse."[11]   (Ex. 2, letter of Yaëlle Cohen at 5). Bryan's aunt explains that she has "witnessed first-hand Bryan paying an important psychological price for his actions; not because he has pity on himself, but rather because he realizes the consequences of the events on his parents, his family, his friends and colleagues." (Ex. 6, letter of Valerie Perez at 2–3).   One of Bryan's cousins, who has "been present for Bryan almost daily since the onset of these events," similarly states that "Bryan is undoubtedly extremely remorseful for his actions; he is utterly broken by all the hurt this has caused his family," and also adds that "[h]e is distraught by the realization of the damage he has done to his own future, and the fact that this damage will not only affect him, but also the life of those around him, who he cared for and supported so generously." (Ex. 57, letter of Rohit Sawhney).

Dionas Sotiriou, one of Bryan's closest friends, says the following:

Bryan has paid and will be paying the harshest price for his misconduct—he has lost all that is dearest to him. Not only the career and reputation that he has spent all his life building and will be unable to restore, but most importantly he betrayed his values that I know are paramount to his life. . . . Bryan's sentence already started two years ago as he has been living with shame and remorse since he decided to put an end to his misconduct.

---

[11]  Bryan's mother left the United States on Feb. 25, 2020, with travels booked to come back in March but was forced to stay in France due to the United States travel ban from Europe imposed in Mar. 13, 2020, and subsequent lockdown orders in France.

. . . I have witnessed Bryan embark immediately on a journey of self-reflection. Bryan understood immediately the gravity and implications of his actions and started looking for answers and draw lessons. . . . I know it is with the same discipline, spirit and resilience that Bryan will apply these lessons to the next chapters of his life. He has gained perspective on life. Justice is playing its role already; Bryan has slowed down in an otherwise fast paced and demanding life where one can get easily lost.

(Ex. 16, letter of Dionas Sotiriou at 2).

Karl Reed, who has visited Bryan weekly since his arrest, relates:

The three months he has been under house arrest so far have clearly had a significant impact on both his mental and physical health. . . . [and a] visible effect on his family[,] in particular his mother who has spent a lot of time in his apartment with him and feels so much pain at the situation. Furthermore, for such a proud individual who has made his own way in the world with great success, having to burden family members with the financial responsibility of his bail conditions, legal fees and ongoing support has been a source of humiliation for Bryan. On top of the genuine remorse that he feels, I know that this is eating away at him every day. He is angry at himself, and whilst he tries his best to stay positive there has been a noticeable change in someone who has always been so happy and optimistic. . . . His remorse is deep and sincere . . . . I have seen first[-]hand the impact on his mother and father in particular, and this is tearing them apart.

(Ex. 21, letter of Karl Reed at 2).

Spiritual leaders close to Bryan also talk about his contrition and process of self-reflection he has embarked on with their help. Rabbi Menachem Mendel Raskin touchingly recounts how, at a meeting which took place during Bryan's home detention, "[Bryan] opened up to [the Rabbi]" and was "undoubtedly very remorseful for his actions." (Ex. 40, letter of Rabbi Raskin at 1). Rabbi Raskin adds that "[i]t was hard to see such a young, intelligent and kind man be in this situation without any solution and without any way to fix what has been done." (*Id.*). Rabbi Haim Shaul also explains how Bryan "has grown spiritually over the last few months" and how they both worked towards finding ways for Bryan to "redeem himself." (Ex. 39, letter of Rabbi Shaul).

48

Rabbi Shaul also observes how Bryan has "accepted responsibility for his misconduct and is focusing on making amends in his life." (*Id.*).

Despite the pain, the regrets and everything that he has lost, Bryan already focuses on his future, his rehabilitation, and ways to reclaim his place as a community member. He is totally "committed to giving everything to regain [his] place in society, contributing and helping others." (Ex. 1, letter of Bryan Cohen at 3).   With his deep-rooted selfless and caring nature, he would like nothing more than to use his "skills to continue to meaningfully impact people's lives." (*Id.*).

### F.   Neither Specific nor General Deterrence Necessitate Sentencing Bryan to a Period of Incarceration

In fashioning an appropriate sentence, the Court should take into account whether a sentence will sufficiently deter the defendant from committing further crimes, and the public at large from committing similar offenses. *See* 18 U.S.C. § 3553(a)(2)(B)–(C).

### 1.   A Period of Incarceration Is Not Necessary to Further the Goals of Specific Deterrence or the Need to Protect the Community

The "likelihood that [a defendant] will engage in future criminal conduct" is "a central factor that district courts must assess when imposing sentence." *Pepper*, 562 U.S. 476 at 492. In this case, there is simply no risk that Bryan will recidivate.

First, as described *supra*, Bryan quickly accepted responsibility for his offense, is deeply remorseful and ashamed by his misconduct. *See United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (stating that § 3553(a)'s "history and characteristics" "sweeping provision presumably includes . . . remorse"); *United States v. Leon*, 19-cr-103, 2019 WL 5423600, at 4 (E.D.N.Y. Oct.

23, 2019) (Weinstein, J.) ("Specific deterrence has been substantially achieved. Defendant has expressed genuine remorse and understands the consequences of future criminal activity. A longer prison sentence would not effectuate further deterrence.").

Furthermore, having settled his parallel civil case with the SEC, Bryan has agreed to a lifetime bar from the securities industry. The crime at issue was "particularly adapted to his chosen career" and "[t]hat career is over." *Emmenegger*, 329 F. Supp. 2d at 428 (finding no chance of recidivism because the defendant had lost his livelihood and his career was over as a result of his conviction). Irrespective of the SEC bar, Bryan will, as a practical matter, be unemployable in the financial industry in the United States and abroad because of his conviction.

Finally, the collateral consequences stemming from Bryan's conviction will be a constant reminder of the severe and deleterious effect of his offense conduct. Bryan has paid and continues to pay a very serious price—both personal and professional—for his crimes. Having experienced the devastating effect of his conviction on his family, friends and ex-colleagues, the Court can rest assured that Bryan will never fall on the wrong side of the law again. The pain that Bryan has caused to his loved ones and to himself serves as a lifelong lesson he will never forget.

In addition to enduring the lifetime penalty of being a felon and its stigma, Bryan has suffered severe public humiliation, which has destroyed his reputation and will follow him for the rest of his life. He has lost a job he loved at the only firm he had ever worked for after graduating, and in the only field in which he has ever been trained. He has lost his entire professional network and has been restrained from having any contact with his former colleagues, mentors, mentees and clients. He has squandered years of hard study, tireless years of professional development, and

permanently forfeited his ability to pursue what was a very promising career in investment banking. At the same time, Bryan has shattered his American dream and he will never be able to reenter a country he aspired to live and build a family in.

Bryan has also been privately shamed. He was handcuffed naked in front of 10 FBI agents, he had to ask his family for help paying rent, and Olga had to take on additional part-time waitress jobs given Bryan's inability to lawfully work during the last seven months of home detention.

Given that there is effectively no risk of Bryan reoffending, no need to protect the community from Bryan committing other crimes, and the devastating impact that the conviction has had on Bryan, a non-custodial sentence would be sufficient to achieve specific deterrence.

### 2.      A Period of Incarceration Is Not Necessary for General Deterrence Purposes

General deterrent interests have already been well served by Bryan's widely publicized arrest, indictment, and guilty plea, seven months of home detention, end to his career, permanent bar from the industry, financial collapse, reputation ruined, felony conviction and certain deportation from the United States. Thus, market participants and those in the financial industry are certainly on notice that engaging in the offense conduct may subject them to the criminal process in addition to the plethora of aforementioned collateral consequences. The public would not look at Bryan and see anything but the devastating potential consequences of engaging in similar behavior. Accordingly, adding a period of incarceration to Bryan's sentence is not necessary to serve the general deterrence purposes under 18 U.S.C. § 3553(a)(2).

Indeed, research has consistently shown that, although the certainty of being caught and punished has a deterrent effect, "imaginable increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Just. 1, 28 (2006). In fact, "[t]hree National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." (*Id.*) (parenthetical omitted).

### G.   A Non-Custodial Sentence Would Avoid Unwarranted Sentence Disparities with Similarly Situated Defendants

Although the primary duty of a sentencing court is to render a just sentence in light of a defendant's particular circumstances, the Court should also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). We submit that only a very significant downward variance from the Guidelines range would avoid an unwarranted disparity between Bryan's sentence and recent sentences for other similar insider trading defendants. In fact, comparing Bryan's conduct to similarly situated defendants, a non-custodial sentence with a supervised release term that incorporates significant community service is most appropriate.

### 1.   Nearly Every Recent Insider Trading Sentences in this District Have Been Substantially Below Guidelines, Including Probation Sentences

The steady imposition of substantially below-Guidelines sentences for insider trading defendants is reflected in recent sentences. Indeed, in the past 18 months alone, several significantly below-Guidelines sentences, including non-custodial sentences have been imposed in the district.

Thus, for example, Woojae Jung (like Bryan) is a non-U.S. citizen and former Goldman Sachs Investment Banking Vice President. Jung pled guilty to both trading himself and also tipping his brother over multiple years regarding 11 companies about which Jung received MNPI through his work. He did so through a brokerage account opened in the name of a college friend and concealed the existence of the account from Goldman Sachs. *United States v. Jung*, 18-cr-518 (S.D.N.Y.) (Kaplan, J.). On June 17, 2019, Jung was sentenced by Judge Lewis Kaplan to three months in prison. Although the loss amount attributable to Jung, $130,000, is less than what Bryan's conduct involves, Jung traded himself on and further tipped MNPI on nearly a dozen different deals that he worked or accessed information on while employed at Goldman Sachs. Furthermore, and notably, there is no suggestion in the court records that Jung terminated his criminal conduct before he was arrested. Bryan, on the other hand, voluntarily ceased his criminal conduct and association with the person he committed the offense with nearly two years prior to his arrest. Thus, given the relative conducts of Jung and Bryan, and the similar positions they held at Goldman Sachs, in order to avoid disparities between similarly situated defendants, a sentence lesser than the three months in prison imposed on Jung should be imposed for Bryan in order to avoid disparities between similarly situated defendants.

In fact, even more recently, on January 17, 2020, Bill Tsai, an investment banker who obtained MNPI through his employment and used the MNPI to make profitable securities trades in his personal secret brokerage account, was sentenced to five years' probation. *United States v. Tsai*, 19-cr-675 (S.D.N.Y.) (Marrero, J.). Tsai received a non-custodial sentence despite orchestrating three different insider trading schemes and lying to his employer about the existence of the brokerage account in which he made the illegal trades, even though the account had been in

existence for more than three years before he began working at the investment bank. He traded himself on the misappropriated MNPI and on at least two occasions further tipped a relative who also traded on the MNPI. *Tsai*, [Dkt. 23], Government's Sent. Submission (Jan. 10, 2020) at 6-7.

Furthermore, on January 17, 2019, Benjamin Chow, founder and manager at a private equity firm, was sentenced to a three-month term of imprisonment following his conviction after trial to eight counts of securities fraud and conspiracy to commit securities fraud. *United States v. Chow*, 17-cr-667 (S.D.N.Y.) (Woods, J.). Chow's advisory Guidelines range was 63 to 78 months' imprisonment, which was driven by illegal profits amounting to approximately $5 million. Chow's insider trading scheme involved numerous disclosures of MNPI surrounding a deal in which his firm was involved in and had executed several non-disclosure agreements with the other party in the deal. *Chow*, [Dkt. 148], Government's Sent. Submission (Nov. 20, 2018) at 1,7. Further, Chow then lied to FINRA about his conduct (*id.*) yet he still received the aforementioned substantial downward variance to a three-month term of imprisonment.

2.      **Similarly, in Less Recent Cases, Numerous Defendants Involved in Comparable or Even More Severe Insider Trading-Related Conduct, Have Been Sentenced to Probation**

Notably, in a case similar to Bryan's, Frederik Bowers, a defendant in the financial industry, was sentenced in this district by Judge Daniels, *United States v. Bowers*, 09-cr-496 (Daniels, J.) (S.D.N.Y. Sep. 16, 2009) to three years' probation with a special condition to perform 2,000 hours of community service. Bowers, who worked for Lehman Brothers, received MNPI from his work partner

Matthew Devlin.[12]   Devlin learned the MNPI regarding the impeding acquisitions of numerous companies from his wife who was an employee at a large public relations firm. On two occasions, Bowers provided this inside information to a client of his, who traded in the securities of the soon-to-be-acquired companies and reaped about $200,000 in illegal profits. Bowers received cash in exchange for the MNPI. Although Devlin traded himself on and tipped seven individuals with inside information about 13 corporate transactions during a four-year period which totaled $4.8 million in illegal profits, Bowers (like Bryan) decided to voluntary cease all criminal conduct after passing on information on two of those 13 transactions.[13]

Furthermore, former Arthur Anderson Managing Partner and board member of Mariner Energy, Clayton Peterson shared MNPI with his son, a participant in the financial industry. Clayton Peterson learned about an impeding acquisition of Mariner Energy following his participation in a Board meeting. He then tipped his son who traded using the MNPI and, in turn, tipped one of his friends who reaped significant profits. In total, in excess of $5 million of illicit profits were generated from the scheme. Clayton Peterson was sentenced to two years' probation. *United States v. Peterson*, 11-cr-665 (Patterson, J.) (S.D.N.Y. Oct. 11, 2011).[14]

---

[12] Matthew Devlin, the mastermind behind the numerous schemes was sentenced by this Court to three years' probation taking into consideration the defendant's cooperation with the authorities, *United States v. Devlin*, 08-cr-1307 (Pauley, J.) (S.D.N.Y. Mar. 23, 2012).

[13] Matthew Devlin also tipped his long-time friend Eric Holzer, an attorney in the New York office of an international law firm and former accountant, who traded on inside information regarding three separate transactions in the course of about two years and generated approximately $120,000 of illegal profits. Judge Marrero sentenced Holzer to five years' probation, *United States v. Holzer*, 09-cr-470 (Marrero, J.) (S.D.N.Y. Sep. 29, 2009).

[14] Drew Peterson, son of Clayton Peterson, was sentenced to three years' probation (advisory Guidelines range of 37 to 46 months). He made approximately $205,000 of illicit profits using the

In *United States v. Allen*, 11-cr-997 (Batts, J.) (S.D.N.Y. Mar. 15, 2016), Scott Allen worked at a large human resources consultant firm and tipped his friend John Bennett about two impending M&A transactions. Bennett netted $1.1 million in insider trading profits and paid Allen significant amount of cash in exchange for the information. Bennett further tipped his business partner, Lawrence Robbins, who reaped an additional $1.5 million in illicit profits. Both co-defendants Allen and Bennett were given non-incarceratory sentences while Robbins was never prosecuted criminally.

Likewise, Judge Denny Chin sentenced Ken Okada, a former Bear Stearns broker, to three years' probation for his participation as both a tipper and tippee in a pervasive insider trading ring. Mr. Okada received $300,000 in profits and made false statements to the FBI prior to his guilty plea. *United States v. Okada*, 07-cr-144 (Chin, J.) (S.D.N.Y. May 6, 2008).[15]

As the cases above demonstrate, non-custodial sentences are common "among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6). Bryan, unlike all of the other defendants (with the exception of *Bowers*), voluntarily ceased his criminal conduct and all contact with the person he committed the instant offense with years before he was

---

misappropriated information from his father, and further tipped his lifelong friend Drew Brownstein, who was a hedge fund manager who reaped approximately $5 million of illicit profits. *United States v. Peterson*, 11-cr-664 (Patterson, J.) (S.D.N.Y. Apr. 11, 2012).

[15] *See* also *United States v. Kwok*, 12-cr-405 (Patterson, J.) (S.D.N.Y. Oct. 17, 2012) (defendant sentenced to two years' probation after trading on inside information received from an individual, and in turn providing inside information to that same individual); *United States v. Ng*, 11-cr-161 (Rakoff, J.) (S.D.N.Y. May 9, 2012) (tipper who violated his fiduciary duties sentenced to probation); *United States v. Collotta*, 07-cr-143 (Marrero, J.) (S.D.N.Y. Oct. 4, 2007) (Morgan Stanley attorney working in the Compliance division of the investment bank at the apex of the scheme sentenced to four years' probation, six months home confinement, and 60 days in the custody of the Bureau of Prisons on nights and weekends).

arrested. Moreover, Bryan never lied to FINRA, the SEC or the FBI about his conduct, he never

traded a single stock, and accepted responsibility immediately.

While some of the defendants in the above-described cases were facing slightly lower

advisory Guidelines ranges because of lower "loss amounts," this is a distinction without a real

difference and should not result in any unwarranted sentence disparity analysis since that analysis

should be driven by the actual conduct of the defendant and his comparators.

Accordingly, we respectfully submit that a non-custodial sentence is warranted to avoid

disparities between similarly situated individuals. We also submit that a sentence of time served

with significant community service is even more appropriate given the 7-month period of home

detention that Bryan has already endured (which none of the other defendants that we cite

experienced prior to sentencing), and the inequitable potential custody implications (discussed

below) which would arise from any period of incarceration due to Bryan's non-citizen status.[16]

### H.     The Danger of Sentencing Disparity is Greatly Enhanced by Virtue of Bryan's Non-Citizen Status

The need to avoid unwarranted sentencing disparities among defendants with "similar

records" who have been found guilty of "similar conduct" is particularly acute here given Bryan's

non-citizen status. If sentenced to any period of incarceration, Bryan will suffer a much more severe

---

[16] *See*, for example, Judge Weinstein's Statements of Reasons in sentencing Lin Feng Xu to time served and supervised release in *United States v. Xu*, 11-cr-777, 2012 WL 955366 (E.D.N.Y. Mar. 13, 2012), stating that the defendant, a citizen of the People's Republic of China whose family resided in China, "suffered the equivalent of severe house arrest while on bail awaiting sentence—roughly the equivalent of a jail term of five months."

punishment than a U.S. citizen if given the same sentence given any time in prison would be significantly longer, more restrictive and served in much harsher conditions than a similarly situated U.S. citizen.[17]

Particularly, Bryan would not be able to serve his time in a minimum-security camp. Rather, he would most likely be designated to a private, for-profit prison that could be located anywhere in the country. Additionally, he would not be eligible for any early release program or halfway house and he would spend an indeterminate period following any imprisonment in an immigration facility awaiting removal from the United States to his home country.

These facts are of utmost relevance in determining Bryan's sentence, especially in the context that, if the Court concludes that some measure of confinement is necessary, home confinement to be served in France is a reasonable, appropriate and effective manner to achieve this additional punishment as opposed to an unnecessarily harsh imprisonment in the United States separated from all his family and Olga.

Our suggested alternative is in fact the conclusion that Chief Judge McMahon reached in *United States v. Connolly*, 16-cr-370 (S.D.N.Y. Oct. 24, 2019), when sentencing Gavin Black. Black was convicted after trial for conspiracy to commit wire fraud and bank fraud, and, rather than following the Government's recommendation of a very substantial term of incarceration, Chief

---

[17] *See*, for example, *United States v. Millul*, 18-cr-579 (S.D.N.Y.) (Rakoff. J), [Dkt. 156] Sent. Tr. (Aug. 27, 2019) at 26:3-13, where Judge Rakoff decided that a sentence of imprisonment four months lesser than he originally intended to impose was appropriate in light of "the ICE problem and the camp problem." In this case, the defendant, Jeremy Millul, was, like Bryan, a French citizen facing the same adverse custody consequences due to their citizenship.

Judge McMahon sentenced Black to three years' probation and nine months of home confinement to be served in his home country, the United Kingdom. Chief Judge McMahon commented:

> If I could sentence Mr. Black to a term of incarceration -- a brief term of incarceration -- knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a non[-]citizen -- and I use that term advisedly, he is not an illegal alien – [b]ut because he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. And that's not right… -- for reasons I cannot comprehend, at the end of that term he could not walk out the door and be picked up by [his attorney] and taken to the airport. He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported. And that's not right. … I can't bring myself to impose a sentence of incarceration in the United States for Mr. Black.

(*See Connolly*, [Dkt. 457] Sent. Tr. (Nov. 19, 2019) at 91:8–92:13).

As described below, Bryan's immigration status will result in the same disparate treatment to which Black would have been subjected to but for Chief Judge McMahon's creative alternative to an otherwise rigid and problematic system for sentencing individuals like Black, Bryan and others.

### 1.   If Sentenced to Any Term of Incarceration, Bryan Would Be Subject to Far More Severe Conditions of Confinement Than Similarly Situated Citizens

If Bryan were a United States citizen sentenced to a period of incarceration, as a non-violent first-time offender, he would be assigned to a prison camp—the least restrictive "minimum-security" facility within the BOP. However, given his non-citizen status, Bryan would be classified by the BOP as a "Deportable Alien" and would be designated to at least a "low-security" (or some other higher-security facility). "The environment at a Low security facility is significantly harsher and more difficult than that of a camp. This difference has a stark impact, from restrictions on

59

inmates, quality of life due to crowding and the scope of visitation rights, and perhaps most importantly, the danger posed by other inmates."[18]   (*See* Ex. 70, The Aleph Institute Letter at 2).

Moreover, in January 2018, the Trump Administration required that the BOP re-designate all low-security male, non-U.S. citizen inmates with 90 months or less remaining in their sentence for transfer to a contract, for-profit prison. (*See* Ex. 71, Bureau of Prisons Memorandum for Chief Executive Officers, Increasing Population Levels in Private Contract Facilities (Jan. 24, 2018)).[19]

As the 2016 Office of the Inspector General ("OIG") "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (*see* Ex. 72) found, for-profit prisons are significantly more abusive, violent and dangerous than those run by the BOP. One of the conclusions of the report stated that "contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." (*Id.*)

Furthermore, and extremely relevant in the context of the COVID-19 proliferating in our prisons, the report also faulted the BOP for failing to verify that these private prisons provide basic medical services to inmates, "the BOP onsite monitors were not verifying each month whether inmates in contract prisons were receiving basic medical care." (*Id.*).   These for-profit facilities have a history of failing to provide adequate medical care to the inmates entrusted to their supervision. In fact, the report makes the troubling finding that these facilities were medically

---

[18]  "This limitation [also] rules out designation to facilities with active Jewish populations and full religious availabilities such as the FCI prison camp at Otisville." (*See* Ex. 70, The Aleph Institute Letter at 2).

[19]  Despite this policy, as Bryan's counsel, if the Court concludes that a term of imprisonment is necessary, we would try to have Bryan placed in a BOP facility.

understaffed and "raised concerns that *medical understaffing on the part of the contractor was financially incentivized because it costs the contractor less to pay penalty deductions for understaffing than to staff the prison adequately*." (*Id.*) (emphasis added).

Lastly, although the BOP generally attempts to hold prisoners within 500 miles of the location where they have the most "community and/or family support," non-citizens, like Bryan, are exempt from this rule and are often placed in prisons much farther from their homes. In Bryan's case, he has no family support in the United States and a designation at a facility geographically remote from New York would make it even more difficult for his family, Olga or his friends to visit, compounding the harshness of such penalty.

2.    **Unlike Similarly Situated Citizens, Bryan Would Also Be Ineligible for Many Other Significant Benefits and Early Release Programs**

Bryan's immigration status also means that he would be ineligible for any early release or partial home confinement programs. As described in more details in the Aleph's letter (*see* Ex. 70, The Aleph Institute Letter at 3), Bryan would not be eligible for a halfway house or home confinement towards the end of his sentence, he would not be able to earn time by participating in certain programs, and he would not be eligible for any furlough. As a non-citizen, if Bryan is sentenced to a term of incarceration, his sentence will be functionally longer than someone similarly situated.

3.       **Unlike Similarly Situated Citizens, Any Sentence of Incarceration for Bryan Will Be Followed by Substantial Additional Incarceration at an ICE Detention Center, in Deplorable Conditions**

Finally, if Bryan were to be sentenced to any period of incarceration, upon completion of his sentence under BOP custody, he will be transferred directly into ICE custody and will stay unnecessarily incarcerated for additional weeks or months pending removal proceedings, thereby further extending the inequitable duration of his time beyond bars as compared to a similarly situated citizen. Bryan "would be essentially serving several additional months in prison as a result of the massive backlogs of deportable aliens." (*Id.*).

To make matters even worse, the level of additional time behind bars that would follow a prison sentence is likely to be served in deplorable conditions, thereby further exacerbating the undue disparity in punishment that would result. *See* Department of Homeland Security, Office of Inspector General Report number OIG 19-47 dated June 3, 2019 entitled "Concerns about ICE Detainee Treatment and Care at Four Detention Facilities." (*See* Ex. 73).   The report details some remarkable and disturbing findings at ICE detention centers including the one in Essex County, NJ. The Inspector General describes significant food safety concerns, including risk of food-borne illness, inadequate medical care, improper punitive segregation (including strip searching detainees who were being moved into segregation absent an infraction), substantially subpar clothing, lack of basic supplies critical to the most basic personal hygiene, dilapidated bathrooms permeated with mold and unusable toilets, nooses in cells, and other dangers and violations. (*Id.*)

In conclusion, if sentenced to any term of incarceration, Bryan will end up serving far more prison time than the Court orders and far more time behind bars than others who committed the

same offense who are citizens. Bryan's respectful request for a non-custodial sentence would go a long way towards remedying the disparate treatment the sentencing statute seeks to avoid.

I.     **The COVID-19 Pandemic Coupled with Bryan's Specific Medical Condition Reinforce the Necessity for a Non-Custodial Sentence**

COVID-19 has caused an unprecedented global public health crisis.[20]   The virus has paralyzed the entire world. The disease has spread exponentially, shutting down businesses, schools, jobs, courts, countries and life as we know it. At this point, there is no approved cure, treatment, or vaccine to prevent it, and experts believe that developing such vaccine in 18 months would be "ridiculously optimistic."[21]   People with primary risk factors pre-existing medical conditions—like Bryan—face a particularly high risk of suffering severe health effects or dying should they contract the disease.

The unexpected global pandemic has thrown into serious question whether a defendant like Bryan—a non-violent, first-time offender with underlying health conditions, who poses no danger

---

[20]  On March 11, 2020, the World Health Organization (WHO) officially characterized COVID-19 as a pandemic and on March 13, 2020, the President Donald J. Trump declared a national public health emergency. As of May 20, 2020, nearly 5,000,000 people worldwide have contracted the virus of which more than 1,500,000 positive cases in the United States (from 70 positive cases at the beginning of March). More than 325,000 people globally have died after contracting the virus, including more than 92,000 people in the United States which has become the epicenter of the pandemic. This tragic number of fatalities has accrued in the United States over the course of about two and a half months (first confirmed coronavirus-related death confirmed in Feb. 29, 2020). Social distancing protocols remain paramount to slow the spread of the virus. (Source: Johns Hopkins University, *https://coronavirus.jhu.edu/map.html*).

[21]  The timetable for a coronavirus vaccine is 18 months. Experts say that's risky, CNN.com (Apr. 1, 2020), *https://www.cnn.com/2020/03/31/us/coronavirus-vaccine-timetable-concerns-experts-invs/index.html*.

to the public should be incarcerated, when supervised release, a special condition of completing 2,000 hours of community service and an additional condition of home detention is an available and a productive alternative to warehousing a vulnerable individual. As detailed below, placing Bryan into the federal prison population at the present time presents significant health risks, and we respectfully submit that it would be inconsistent with 18 U.S.C. § 3553(a) for the Court to sentence Bryan to a term of incarceration with an indefinite reporting date. Instead, under the present public health emergency, we think it would be most consistent with § 3553(a) for the Court to impose on Bryan a sentence that he can begin serving out immediately without undue risk to his health.

In fact, the BOP and the Government have acknowledged the serious health crisis that COVID-19 poses to the federal prison population. On March 26, 2020, Attorney General William Barr issued a memorandum to the Director of the BOP to express that "at-risk inmates who are non-violent and pose minimal likelihood of recidivism" would be "safer serving their sentences in home confinement rather than in BOP facilities." The Attorney General stated that the BOP should "ensure that home confinement is utilized, where appropriate, to protect the health and safety of BOP personnel and the people in [their] custody." In a further directive on April 3, 2020, the Attorney General stated that "upon [his] finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons," "the CARES Act now authorizes [him] to expand the cohort of inmates who can be considered for home release" and that the "review should include all at-risk inmates—not only those who were previously eligible for transfer." The Attorney General also recognized that "[w]hile BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting [its] inmates, those precautions, like any precautions, have not been perfectly successful at all institutions."

64

In fact, as of May 20, 2020, only two months after the first COVID-19 case was confirmed in a federal prison, the BOP has reported that 4,502 inmates and 577 staff members have tested positive.[22]   Sadly 58 BOP inmates have already died and the death toll keep growing every day as new prison "hotspots" surface.[23]   Although these numbers are frightening, it has been widely reported that they remain flagrantly understated given that as of April 29, 2020, the BOP had conducted only 2,700 tests (less than 2% of the total federal inmates population) out of which more than 70% came back positive.[24]   As mass testing started taking place at Lompoc FCI, another point of reference regarding the pace at which the virus could spread into a facility has become public; already 77% (918 inmates) have tested positive for COVID-19 at this facility. The catastrophic effects that prison outbreaks are having on both the prison population and the community at large are becoming more apparent every day. In fact, the American Civil Liberties Union ("ACLU") in collaboration with its research partners found that COVID-19 could claim the lives of approximately 100,000 more people than current projections stipulate if jail populations are not

---

[22] Of which 2,177 BOP inmates and 389 BOP staff have been reported to have fully recovered. These numbers do not include privately managed prisons which the BOP just started reporting and is showing already 163 positive cases. (Source: *https://www.bop.gov/coronavirus/*).

[23] As of May 20, 2020, 10 out the 15 largest outbreaks in the United States are located in prisons and jails (*https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html*).

[24] More Than 70% of Inmates Tested in Federal Prisons Have Coronavirus, Wall Street Journal (Apr. 30, 2020), *https://www.wsj.com/articles/more-than-70-of-inmates-tested-in-federal-prisons-have-coronavirus-11588252023*. *See also* In four U.S. state prisons, nearly 3,300 inmates test positive for coronavirus -- 96% without symptoms, Reuters (Apr. 25, 2020), *https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in-idUSKCN2270RX*. The article reports that after testing 2,300 inmates at the Marion Correctional Institution, 2,028 tested positive for COVID-19 (88%), out of which 95% were asymptomatic. Similar results came out of testing 4,693 inmates in four separate prisons in Arkansas, North Carolina, Ohio and Virginia, 70% of inmates tested positive of which 96% were asymptomatic.

dramatically and immediately reduced. (*See* Ex. 84, ACLU Report: COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails).

Following those directives, the BOP has already released 2,932 inmates to home confinement.[25]   In addition, courts in the district and across the country have granted a large number of compassionate release motions, finding "extraordinary and compelling" circumstances in light of the serious health risks caused by COVID-19 and recognizing that "the best—perhaps the only—way to mitigate the damage and reduce the death toll [of inmates from COVID-19] is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, 18-cr-713, 2020 WL 1529535, at 1 (S.D.N.Y. Mar. 31, 2020).   In Bryan's case, it would be equally appropriate for this Court to impose a sentence of time served, a two-year term of supervised release with a special condition of 2,000 hours of community service, and a period of home detention, if necessary, in the first instance.[26]   We respectfully submit that it would also fully satisfy the objectives of § 3553(a).

Bryan suffers from chronic asthma for which he has taken medication for more than ten years (*see* Ex. 79, Declaration from Dr. Maurice Levy, M.D., and Ex. 80, Dr. Allouche Medical Diagnosis).   During his asthma attacks, Bryan experiences wheezing, shortness of breath, and

---

[25]  Number of BOP releases to home confinement from March 26, 2020 until May 20, 2020.

[26]  *See United States v. Hernandez*, 18-cr-834 (S.D.N.Y.) (Engelmayer, J.), [Dkt. 440] (Mar. 25, 2020 Order), in deciding on a motion seeking compassionate release for Mr. Hernandez, a 23-year old defendant suffering from asthma, Judge Engelmayer stated that ("[h]ad the Court known that sentencing Mr. Hernandez to serve the final four months of his term in a federal prison would have exposed him to a heightened health risk [from the coronavirus], the Court would have directed that these four months be served instead in home confinement."). After exhaustion of administrative remedies with the BOP, the motion was granted, [Dkt. 451] (Apr. 2, 2020 Order).

constant coughing. Bryan's asthma is aggravated in unclean environment (dust mites) and high stress situations. This condition places him at a heightened risk of suffering severe illness or death from COVID-19 if exposed to the virus. Indeed, the Centers for Disease Control and Prevention ("CDC") has issued guidance identifying individuals at higher risk of suffering severe illness or death from COVID-19 as, among others, those people of *all ages* who suffer from chronic moderate to severe asthma ("People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease.").[27]

The significant risks posed by the pandemic are unlikely to subside for at least over a year. Even if society brings the virus under control for a time, a second wave of COVID-19 infections is expected by all experts—and CDC Director Robert Redfield has warned that this second wave is likely to be even more devastating than the first.[28]   Based on a recent report published by the Center for Infectious Disease Research and Policy ("CIDRAP"), a team of longstanding pandemic experts predicts that "the outbreak will likely last 18 to 24 months," and "it likely won't be halted until 60% to 70% of the population is immune." (*See* Ex. 85, The CIDRAP Viewpoint).   Sentencing Bryan to a term of incarceration with an indefinite reporting date is an untenable solution. Bryan has been under home detention for seven months of which two months have been the result of his sentencing date being adjourned due to the pandemic. Bryan deserves the opportunity to begin serving his

---

[27] *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html*.

[28] CDC director warns second wave of coronavirus is likely to be even more devastating, The Washington Post (Apr. 21, 2020), *https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/*.

sentence immediately so that he could start rebuilding his life and contributing to the community. Forcing Bryan to live with the emotional burden of a looming imprisonment and the financial burden of having to stay under further home detention in the United States (which would not be credited against a potential term of incarceration) with no gainful employment opportunity and separated from his family, would be to impose an additional and unnecessarily harsh punishment, separate and apart from any sentence this Court will impose. Just as Bryan has the right to be sentenced "without unnecessary delay" pursuant to Federal Rule of Criminal Procedure 32(b)(1), so too should he be able to begin serving his sentence.

We respectfully submit that imposing a sentence of time served with a substantial requirement of community service for Bryan, and possibly additional home confinement to be served in France, fully satisfies the objectives of § 3553(a). It is also the most humane sentence considering the serious health risk that imprisonment would pose to him, at a time where inmates with identical risk profiles as Bryan (non-violent offenders posing no risk to the community and who have COVID-19 risk factors) are being swiftly released.

J.    **Should the Court Impose a Sentence of Time Served and Community Service, Supervised Release and Community Service Can Be Served in France**

Should the Court, in its infinite discretion, determine that a sentence of time served and supervised release with a special condition of community service is a sentence that is sufficient but not greater than necessary to promote respect for the law, both supervised release and community service (as well as home detention if deemed necessary, discussed below) can be served and completed, even upon Bryan's removal and deportation to France immediately after sentencing as

68

a result of his felony conviction. We recognize that under normal circumstances, a term of supervised release is generally served in the district within the United States in which the defendant resides; however, we have identified precedents where supervised releases were served in the defendant's home country.[29]   It is also the case that, special conditions of community service or home detention, both to be served in the defendant's home country, have also been imposed.

Specifically, there is precedent for a sentence that includes both supervised release and community service to be completed under circumstances where the defendant will be residing outside the United States after a sentence is imposed. Judge Nicholas Garaufis, in *United States v. Saltsman,* 07-cr-641 (E.D.N.Y. Jul. 28, 2010), sentenced Zev Saltsman, who held dual Israeli and United States citizenship, to three years' probation with a condition to serve and perform 2,000 hours of community service in Israel. Judge Garaufis permitted Saltsman to return to Israel immediately after sentencing with the understanding that he would report to his supervising probation officer in the Eastern District electronically. Judge Garaufis also ordered counsel for Saltsman to provide the Probation Department with periodic, written updates every six months verifying the defendant's participation and his progress in the community service program that had been pre-approved by the Court.

---

[29] *See United States v. Connolly*, 16-cr-370 (sentencing defendant Gavin Black to three years' probation and nine months of home detention to be served in the United Kingdom); *United States v. Curtler*, 15-cr-670 (sentencing defendant to a two-year term of supervised release to be served in the United Kingdom); *United States v. Robson*, 14-cr-272 (same); *United States v. Stewart*, 14-cr-272 (same); *United States v. Yagami*, 14-cr-272 (sentencing defendant to a two-year term of supervised release to be served in Hong Kong); *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (affirming district court's sentence to a term of probation to be served in Belgium).

In the *Saltsman* case, the defendant agreed to undergo training to become a certified emergency medical technician ("EMT") and ambulance driver and thereafter perform 2,000 hours of community service operating a volunteer ambulance in a community which prior thereto was not serviced by any volunteer ambulance service.[30]

In this case, Bryan's outstanding academic background and extensive experience in tutoring mathematics, physics, chemistry, and English to numerous kids for many years, would be a precious asset to countless underprivileged children. Bryan has the energy and genuine desire to teach and help children with learning difficulties and/or unstable family units. Bryan is motivated and passionate about people's development, and we respectfully submit that there is no better way for Bryan to pay back his debt to society than sharing his knowledge and dedicating a considerable amount of his time to giving children in need a chance for a better life, a chance to succeed.

In fact, Bryan has already taken the initiative to agree with Ms. Hauteur, Vice President of the "Centre Communal d'Action Sociale" of Saint-Raphaël ("C.C.A.S."), and Mr. Dahou, Director of the "Point Actions Familles/Jeunes" (department of the C.C.A.S. focusing on families and kids), (*see* Ex. 74, C.C.A.S. Certificate) that, should the Court decide to impose community service as part of Bryan's sentence, the association would welcome Bryan as a volunteer with open arms. Ms. Hauteur declares that Bryan's "skills in numerous subject matters . . . would make him a very

---

[30] Although we recognize that the *Saltsman* case and this case are different in many ways, both defendants were first time offenders who pled guilty to a non-violent offense of securities-related fraud. We also note that both defendants did not have their immediate family in the United States. As more fully discussed in this memorandum, Bryan's family reside in France, with the exception of Olga, whose status in the United States is uncertain and intends to move to France once Bryan is deported from the United States.

precious person for [the] organization." (Ex. 75, letter of Patricia Hauteur, Vice President C.C.A.S. at 1).   The C.C.A.S. is a governmental association which constitutes the main organization to fight social exclusion, help children with learning difficulties, and support elderly and disabled people for the inhabitants of Bryan's hometown, Saint-Raphaël. Bryan would be an invaluable resource for the association whose volunteers are mainly retired teachers. Bryan has suggested to "complement [the association's] support programs through a "Mentoring" initiative of 5-10 children in need" which would focus on "help[ing] underprivileged kids with their daily struggles." (*Id.*)   Ms. Hauteur adds that "[t]his new initiative could answer the needs of a number of children and/or teenagers who come through [their] door." (*Id.*)   The learning difficulties faced by children from underprivileged backgrounds are even more acute in the context of the global pandemic where e-learning has not been available to all, and kids haven't gone to school in months. Aware of this new reality, Bryan has in fact already dedicated some time to helping children in his personal network during these difficult times.

If approved by Your Honor, Bryan would dedicate at least the equivalent of a full-time year of work (2,000 hours) to teach and nurture underprivileged kids in his hometown, without any compensation.

We submit with great respect for the independence and integrity of this Court that our proposal, under the circumstance of this case as to this defendant, is in our opinion, an enlightened recommendation that would provide a way for a fair and just punishment to achieve something meaningful, beneficial and productive for the community. As discussed *supra*, in view of the COVID-19 pandemic that is currently straining the BOP's limited resources, our proposal will also

avoid warehousing a vulnerable non-violent first offender thousands of miles away from his family at a precarious time.

### K.   Should the Court Deem Further Confinement Is Necessary, Home Detention Can Be Served in France

For the reasons set forth above, we respectfully submit that a sentence of time served, two years of supervised release in France and 2,000 hours of community service is sufficient but not greater than necessary to satisfy the § 3553(a) factors. However, to the extent that the Court concludes that additional confinement, above and beyond the seven months of home detention Bryan has already endured, is necessary, we respectfully submit that adding a special condition of home detention to be served in France balances the need to restrict Bryan's liberty with the collateral consequences of his status as a non-citizen and the danger paused by the global pandemic.

Bryan's status as a non-citizen should not subject him to "adverse" sentencing treatment. *See, e.g., United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994) ("A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing.").   Bryan should not receive disparate treatment from citizen defendants in connection with a possible sentence of home detention.

The fact that Bryan will reside in France should not be an impediment to confirming his presence in his residence at the appropriate time. In fact, as discussed *supra*, a sentence of home detention to be served abroad has already been imposed in the district as part of Gavin Black's sentence. Furthermore, we have worked with a private security company in order to identify a proposal that would allow for a sentence of home confinement to be administered in France under

the same conditions as that would apply to United States residents, including 24/7 electronic monitoring if required (*see* Ex. 77, Subrosa Group's Proposal).[31]   The Subrosa Group includes "former elite Special Forces operatives, Government Security Services and Senior Police Officers" (*id.* at 6) who have extensive experience in their field.[32]   Bryan would comply with any special conditions of supervised release in accordance with the Court's and the Probation Department's direction, including home confinement and reporting.[33]

---

[31] If the Court decides to include home detention in France as part of the sentence imposed, Bryan would be living with his parents in his hometown, Saint-Raphaël, located in the Var region in France, which out of approximately 1,076,000 inhabitants has about 1,109 reported COVID-19 hospitalizations and 125 deaths as of May 20, 2020, a very low infection and fatality rate (Source: *https://www.nytimes.com/interactive/2020/world/europe/france-coronavirus-cases.html*).

[32] *See* www.subrosagroup.co.uk. For the Court's convenience, we have also included the resumes of the Subrosa Group employees who would be primarily responsible for any such Court-order electronic monitoring. (*See* Ex. 78, Subrosa Group – Resume of Key Operatives).

[33] Bryan's flawless performance on home confinement for the past seven months further demonstrates his essential nature as a rule follower. There is no reason to doubt that he will continue to abide by any order imposed by the Court in the context of a special condition of community service or home confinement. Furthermore to the extent the Court wishes to receive additional assurances, counsel could provide the Court with the identity of a United States citizen or an individual with significant assets in the United States with strong moral suasion over Bryan who would agree to serve as a surety, and forfeit a specified sum of money or assets located in the United States in the event the defendant were to violate any of the conditions of his supervised release or otherwise fail to complete the specified number of hours of a community service program in a satisfactory manner.

## VII.   <u>CONCLUSION</u>

Bryan Cohen voluntarily disassociated himself with all criminal conduct years before his arrest, pled guilty early, accepted responsibility, and has satisfied his forfeiture obligation in full prior to sentencing. He has shown extreme remorse and already paid dearly for his transgression. In light of Bryan's exemplary character, prompt acceptance of responsibility, long history of devotion to family and friends, extensive record of charitable acts and the need to avoid unwarranted and severe sentence disparities, we respectfully request that the Court impose a sentence of time served and supervised release, with very substantial community service focused on helping underprivileged children. Bryan makes the community a better place; he has the energy, the skills and a great project with a clear mission to repay his debt to society. Such a sentence is sufficient but not greater than necessary and represents a proper balancing of the history and characteristics of *this* defendant with the nature and seriousness of *this* offense.

Should the Court, however, deem that some additional confinement is necessary to achieve a just punishment, we respectfully submit that a special condition of home detention would satisfy this objective. Such a condition balances the need to restrict Bryan's liberty with the inequitable custody consequences of his status as a non-citizen and the unnecessary danger caused by incarcerating a deportable, non-violent, first-time offender with a primary risk factor for COVID-19 during the unprecedented global pandemic.

Dated: May 20, 2020
      New York, New York

Respectfully,

**Brafman & Associates, P.C.**
*By:*  Benjamin Brafman
      Joshua D. Kirshner
      *Attorneys for Bryan Cohen*
      767 Third Avenue - 26th Floor
      New York, NY 10017